No. 2--03--1409          Filed:  3/31/06

_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | No. 02--CF--2693 |
| v. | ) ) | |
| ERICK RODRIGUEZ, | ) ) | Honorable Mary S. Schostok, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Erick Rodriguez, appeals from his convictions of aggravated criminal sexual assault (720 ILCS 5/12--14(a)(1) (West 2000)) and unlawful restraint (720 ILCS 5/10--3(a) (West 2000)).  He argues that his trial counsel provided ineffective assistance of counsel and that the trial court erred in sentencing him on the aggravated criminal sexual assault conviction.  We affirm but reduce defendant's sentence on the conviction of aggravated criminal sexual assault from 24 years to 12 years.

BACKGROUND

The State charged defendant with sexually assaulting R.C. and unlawfully restraining her and her companions, sisters LaParis and Rashawndra Coleman, at Bowen Park in

Waukegan in the early morning hours of July 24, 2002.  Defendant was charged with one count of aggravated criminal sexual assault and three counts of unlawful restraint.

R.C., LaParis, and Rashawndra  gave substantially similar accounts of the events at issue.  We recount their collective testimony while pointing out relevant differences.  On July 23, 2002, between 11 and 11:30 p.m., R.C., LaParis, and Rashawndra were standing with some acquaintances near 8th Street and Lincoln in Waukegan.  Rashawndra flagged down a passing car, which was occupied by defendant, who was the driver, and two male passengers.  Although none of the women knew defendant or his companions, Rashawndra asked defendant to give her and her companions a ride.  Defendant agreed, and the women sat in the backseat, with one of the passengers.  The women asked defendant take them to Burger King, and he agreed.  On the way to Burger King, defendant gave the women his address at their request.  (Rashawndra and LaParis differed over whether defendant gave his name as well.)  While at Burger King, the women ordered food.  After the party left the restaurant, defendant told the women that he wanted to get a bigger car to accommodate all his passengers.  He drove to a house on 10th Street in North Chicago.  There, defendant announced that he had to urinate and then exited the car, with his companions.  The three men went to the back of the house.  When they returned a few minutes later, they stood near the car, speaking Spanish for about five minutes.  None of the women understood the conversation.  When the men reentered the car, Rashawndra, who had consumed a beer defendant had given her (neither defendant nor the women were of legal drinking age), asked him to drive to a liquor store called Handy's, on 10th

Street.  Defendant agreed, but drove on 10th Street in the direction opposite from Handy's. When defendant turned from 10th Street onto Sheridan Road,  Rashawndra asked why defendant was not driving to Handy's, and he replied that he was going to a different liquor store.  Defendant then drove into Bowen Park.  LaParis testified that she sensed danger and asked defendant just to take her and her companions home.  Defendant replied that he again had to urinate.  He parked the car in a parking lot that was illuminated by a streetlight.  Defendant stepped out of the car and retrieved from the floorboard what appeared to the women to be a handgun but what was in fact a pellet gun.  He pointed the gun at LaParis and ordered the women to exit the car.  When they complied, defendant ordered them to walk across a grassy expanse toward a wooded area.  The women testified that the woods were entirely dark and that they could not see into them at all.  As the women walked toward the woods, followed by defendant and his companions, defendant ordered them to drop the extra clothes they were carrying with them for laundering.  The women complied and then entered the woods.  They came to the head of a staircase made of wooden oversized steps set into the ground.  There were no lights on the staircase.  Defendant ordered the women to walk down the stairs while he and his companions remained above.  When they had partially descended the stairs, defendant told the women to stop and directed R.C. to walk back up the stairs toward him while LaParis and Rashawndra remained behind.  Defendant then ordered R.C. to cross the staircase railing and walk  into the woods.  After R.C. had walked a short distance into the woods, defendant told her to stop.  He gave the gun to the front-seat passenger, who pointed it at LaParis and Rashawndra.  Defendant asked the women and the men if anyone had any condoms, and they all said no.  Defendant then ordered R.C. to pull down her pants.  When

she refused, defendant pulled down her pants as well as his own. Defendant then bent R.C. over and raped her from behind. R.C. felt defendant ejaculate after about two to three minutes. When defendant pulled his pants back up, he told R.C. to walk over to where the other men were standing.[1] Defendant and his companions then walked back toward the parking lot. R.C. and the two other women ran down the staircase. They climbed a fence and entered a residential area. The resident of the first house at which they sought help refused to open the door, but the resident of the second house they went to let them in and dialed 911 for them. The police arrived and transported R.C. to the hospital, where a rape exam was performed on her. The emergency physician on duty testified that he performed a pelvic examination on R.C. but found no signs of trauma. However, the physician also noted that not all sexual assault victims show evidence of trauma. The parties stipulated that DNA taken from sperm found in R.C.'s vagina matched the DNA profile created from samples of defendant's blood.

R.C. testified that defendant was the man who sexually assaulted her, but admitted that she was not "100 percent sure" defendant was the perpetrator. R.C. also testified that,

---

[1] R.C. described another act of sexual abuse that LaParis and Rashawndra did not mention. R.C. testified that, after raping her, defendant ordered the male backseat passenger to rape R.C. When the man refused, defendant took the gun from the front-seat passenger and threatened the backseat passenger, who then led R.C. into the woods. The backseat passenger pretended to rape R.C., fondling her breasts and rubbing his penis against her backside. When the man was finished, he rejoined defendant and the other man.

after defendant raped her, she heard clicking sounds from the gun that led her to suspect that it was not a real firearm. However, after observing the reaction of the backseat passenger when defendant pointed the gun at him, she again believed the gun was real. R.C. admitted telling police officers that she believed the gun was fake at one point during the encounter, but she clarified in her testimony that she did not believe the gun was fake throughout the whole encounter.

A Waukegan police officer testified that he was dispatched to Bowen Park in the early morning hours of July 24, 2002. He testified that he observed several articles of clothing between the parking lot and the top of the staircase.

Charles Draper testified that, on July 24, 2002, between 12 a.m. and 1 a.m., he and his wife were awakened by noises outside their home. Draper then heard banging against his back door. Draper went to the door and saw two black women and one Hispanic woman. Draper testified that the women were disheveled and shaken and that they said, "They're after us, they're going to kill us, please let us in." Draper let the women inside and dialed 911.

Waukegan police detectives described how they located both defendant and the car that matched the description given them by R.C., LaParis, and Rashawndra. A pellet gun was found during the search of the car. The State introduced into evidence a written statement that defendant gave police after waiving his <u>Miranda</u> rights. The statement, translated from Spanish, reads as follows, in broken English:

"I found them at Lincoln and 8th and we went and with two friends we went to for Burger King. I was driving my red car with two friends and I saw three girls on 8th and Lincoln and we asked them if they wanted a ride and we told them to wait

and later they got in and told us that they were hungry and we bought them Burger King and liqour [sic] and we went to a park and me and a friend took out a miniature toy pistol. Eusebio was over there still and Jordo and Erick. Eusebio paid for all of the expenses and to deceive them and that we were going to buy liquor and to take them to the park and to have sex. I had sex because I had the pistol and the girls were afraid, and for that they had sex with me. The girls did not know what we were going to do with them. But my friends knew what we were gong to do. And the black girls, we told them to go underneath the stairs and we asked the Mexican girl to lower her pants so they can have sex with her. I imagined she was afraid because we asked her to bend down so that we can have sex with her. We finished her and did not use a condom and later that we were finished we began to run and we got into the car and went to sleep."

The detectives documented a specific question that they asked defendant: "Why did you do this to her?" Defendant answered in writing: "Because I was horny and I was not thinking in that I was going to do any harm. I was not thinking in anything. She was attractive and pretty."

Defense counsel cross-examined the prosecution witnesses as to the ability of LaParis and Rashawndra to see what took place between defendant and R.C. after he called her back up the stairs. LaParis and Rashawndra were in disagreement over how far down the stairway they were when they witnessed the sexual assault. LaParis testified that they were 12 or 13 steps down from where R.C. was standing, while Rashawndra estimated that they were 6 steps away. Rashawndra admitted she told police that she and LaParis were halfway down the staircase. An investigator for the Lake County State's

Attorney's office, who took various photographs of the staircase for investigative purposes, admitted on cross-examination that the streetlight in the parking lot was not visible from halfway down the staircase. Both women, however, insisted that, though the stairs did not have their own light source, the streetlight from the parking lot illuminated the stairs enough for them to see that defendant was raping R.C. R.C., too, testified that the light from the parking lot illuminated the top portion of the stairs. LaParis testified that she was particularly able to see defendant and R.C. because of the light-colored clothing both were wearing. LaParis further testified that she did not remember telling Waukegan police detectives that she had her back to R.C. during the sexual assault. In his case in chief, defendant called two Waukegan police detectives who testified that LaParis told them that she did not witness the sexual assault because she had her back turned and that Rashawndra told them that R.C. was on her back, not bent over, during the sexual assault. One of the detectives also testified that R.C. told them she did not believe the gun was real, but, on cross-examination by the State, the detective admitted that R.C. did not identify exactly when during the encounter she believed the gun was not real. Defendant called another detective who testified that he had shown R.C. a photo array that included defendant's picture and that R.C. was "not sure" which picture showed her attacker.

Defendant testified in his own defense. He testified that, on the night of July 23, 2002, he left home to get beer with his friends Jose and Usavio DeLao. Between 10:30 and 11 p.m., the three were flagged down by three women standing on the corner of Lincoln and 10th in Waukegan. The women entered the car and asked defendant and his friends to buy them food. Defendant drove to Burger King, where his friends bought food for the women. The women ate the food and also drank beer that the men had bought.

The women asked if defendant had a bigger car.  Defendant replied that he could borrow a van from a friend.  Defendant drove to his friend's home but the friend was not there.  While at the home, defendant and Jose exited the car and spoke about where they could get a bigger car.  When they got back in the car, they asked the women if they were fine with beer, and the women replied that they preferred Bacardi rum.  Defendant testified that he and his companions looked in vain for a place they could buy alcohol.  The six of them ultimately decided to go to Bowen Park.  Defendant had a toy gun in the car, and on the way to Bowen Park, Jose played with the gun by "clicking" it.  Defendant described what happened after they arrived at the park:

"Q.  Did everybody get out?

A.  Yes.  The six of us stepped out.

\* \* \*

Q.  Did you eventually have intercourse with [R.C.]?

A.  Yes.  Exactly.

Q.  Did you use any force on [R.C.] to have the intercourse?

A.  No.  Everything was voluntary.

Q.  Did you have any conversation with her prior to having the intercourse?

A.  Well, we had conversation.  We exchanged addresses in order to get out on

some other occasion.

\* \* \*

Q.  Was there any conversation with respect to drugs?

A.  Yes.

Q.  What was the conversation?

A.  If we had any marijuana with us.

Q.  What did you tell them?

A.  I said yes, we had some in the car.

Q.  Did you have any in the car?

A..  No.  I didn't have anything.

Q.  When you had the intercourse with [R.C.], was there to be any consideration

for that intercourse?

MR. STRIDE [Assistant State's Attorney]:  I object.

THE COURT:        Overruled.

THE WITNESS:  Everything was in exchange for drugs.

MR. RAFFERTY [defense counsel]: When you say drugs, you mean marijuana?

A.  Yes.

Q.  They are not talking about cocaine or heroin?

A.  No."

Defendant denied that he ever threatened R.C. with a gun.  When asked why he said otherwise in a written statement to police, defendant explained that he did so out of fear of the police, because  one of the detectives who arrested him threw him against a wall.

During the jury instruction conference, the trial court granted defendant's request for an instruction on the lesser included offense of criminal sexual assault (720 ILCS 5/12--13 (West 2000)).  The jury found defendant guilty of aggravated criminal sexual assault,

criminal sexual assault, and unlawful restraint. The convictions of criminal sexual assault and aggravated criminal sexual assault were merged.

Subsequently, defendant retained a new attorney and filed a posttrial motion alleging that his trial attorney had provided ineffective assistance of counsel. Following a hearing at which trial counsel testified, the court denied defendant's motion. The matter proceeded to sentencing, where the trial court heard evidence in mitigation and aggravation, as well as defendant's allocution. Operating under the misapprehension that defendant was convicted of two counts of aggravated criminal sexual assault rather than one, the trial court imposed two consecutive 12-year terms of imprisonment. The parties brought the matter to the attention of the trial court the next day, and the trial court resentenced defendant to 24 years on the one count of aggravated criminal sexual assault. The trial court justified the increased sentence on the one count as being consistent with the court's original aim of sentencing defendant to a total of 24 years of imprisonment for the sexual assault of R.C. The trial court denied defendant's motion to reconsider, and this timely appeal followed.

ANALYSIS

I.      Ineffective Assistance of Trial Counsel

Defendant's first contention on appeal is that his trial counsel was ineffective in various ways. Illinois courts address ineffective assistance of counsel claims under the two-prong test established in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). People v. Albanese, 104 Ill. 2d 504, 526-27 (1984). Under Strickland, a defendant must prove (1) that defense counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for this substandard performance, the result of the proceeding would have been different.

People v. Alvine, 173 Ill. 2d 273, 293 (1996). Effective assistance of counsel means competent, not perfect, representation. People v. Odle, 151 Ill. 2d 168, 173 (1992). There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065; People v. Miller, 346 Ill. App. 3d 972, 982 (2004). For purposes of Strickland's first prong, it is not enough that another lawyer, with the benefit of hindsight, would have acted differently than trial counsel. People v. Young, 341 Ill. App. 3d 379, 383 (2003). Only the most egregious tactical or strategic blunders bring counsel's representation below Strickland's standard of objective reasonableness. People v. Briones, 352 Ill. App. 3d 913, 918 (2004). Even if trial counsel did not provide assistance that was objectively reasonable, the defendant must still show a reasonable probability that counsel's shortcomings prejudiced the defendant. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. Mere conjecture and speculation are not sufficient to establish this probability. People v. Gosier, 165 Ill. 2d 16, 24 (1995). Defendant identifies trial counsel's overarching error as his failure "during any portion of the trial to adequately present defendant's defense, that [R.C.] had consented to have sexual relations with defendant in exchange for marijuana." Defendant pinpoints specific ways in which he believes trial counsel failed to advance the defense of consent. First, he claims that trial counsel gave an inadequate opening argument, which was as follows:

"Please the Court [sic], your Honor, Mr. Stride, Ladies and Gentlemen of the Jury.

As the Judge has told you, what I say, what Mr. Stride says is not evidence. The only evidence in this case is going to come from that witness stand in the form of oral testimony from witnesses or in documents that are tendered and admitted into evidence. So I'm not going to waste your timing by standing up here and telling you what I think the evidence will be. The judge has told you that you are not to base your decision on speculation. And anything that is said here is speculation. ***

I am simply going to ask, Ladies and Gentlemen, that as you have promised to pay

close attention to the testimony and then to make an informed decision. Thank you." Defendant notes that trial counsel did not lay out a vision for the defense's case, but simply urged the jury to concentrate on the evidence rather than the arguments of the parties. "A defense attorney's decision to make or waive an opening statement on behalf of a defendant is a question of judgment in strategy or tactics that will not in and of itself demonstrate the ineffective assistance of counsel." People v. Penrod, 316 Ill. App. 3d 713, 724 (2000); see also People v. Georgev, 38 Ill. 2d 165, 169 (1967). "Although an opening statement is ordinarily important in order to provide the jury with a clear understanding of the theory of the case or to explain complex issues [citation], there are strategic reasons for waiving the opening statement [citation]." Penrod, 316 Ill. App. 3d at 724. Apparently aware of these principles, defendant qualifies his argument with a concession:

"Trial counsel asked the jury to just pay close attention to the testimony. This may have been sound trial strategy, if trial counsel had then challenged the testimony of the State's witnesses and/or presented testimony of the defendant's version of the incident; however, none of this ever occurred."

As defendant appears to recognize, we cannot deem the opening statement a Strickland violation in itself, but must judge counsel's performance in its totality. People v. Groves, 287 Ill. App. 3d 84, 93 (1997) ("[w]hen applying the Strickland standard, a court is to view the totality of counsel's conduct in light of all the circumstances").

Next, defendant challenges the adequacy of the cross-examinations of R.C., LaParis, and Rashawndra. A defense attorney's cross-examination of a witness is considered unsound under Strickland's first prong only if there is an utter failure to conduct any meaningful adversarial testing. People v. Reid, 179 Ill. 2d 297, 310 (1997). Such was not the case here. Trial counsel thoroughly cross-examined LaParis and Rashawndra about their ability to see what transpired between R.C. and defendant, several stairs above. Trial counsel exposed inconsistencies between the two witnesses' testimony as to how far down the stairs they were when they saw R.C. with defendant. Both women testified that they could adequately see R.C. and defendant from their positions on the stairs because the light from the parking lot illuminated the area around R.C. Rashawndra, however, admitted that she told police that she was halfway down the stairs when she saw defendant rape R.C., which was significant in light of the fact that an investigator for the Lake County State's Attorney admitted under cross-examination that he could not see the parking lot light from halfway down the stairs. Defense counsel's cross-examination of R.C. was brief and pointed. Defense counsel concentrated primarily on R.C.'s testimony on direct examination that she submitted to defendant because of the gun, which, at that time, she believed was a genuine firearm. Defense counsel elicited from R.C. an admission that she told police that she believed the gun was a "fake" at one point during the encounter.

Defendant argues that the cross-examinations of LaParis, Rashawndra, and R.C. were inadequate because the defense at trial "was not that [LaParis and Rashawndra] could not see the sexual encounter" but that R.C. "had agreed to it." "The jury," defendant asserts, "needed to hear why the witnesses would falsify what happened, in order to make the inconsistencies mean anything." Trial counsel had his reasons for not pressing the defense's theory of the case more forcefully. Trial counsel testified at the hearing on defendant's Strickland motion that he did not question R.C. about the possibility that she consented to sex with defendant, because "[s]he wasn't likely to change her response and reply to my questions, and the only purpose that would have been served would have been to hammer the forcefulness of the act into their minds." Trial counsel was not asked why he did not raise the issue of consent with LaParis and Rashawndra, but we can surmise that his reasons were the same. In our view, trial counsel's caution on cross-examination was grounded in reasonable defense strategy. Trial counsel appropriately used cross-examination to undermine the plausibility of the State's theory of the case (i.e., that R.C. was raped at gunpoint on the stairs), while reserving his articulation of the defense theory for defendant's testimony and closing argument.

Defendant insists, however, that trial counsel did not adequately raise the theory of consent either during defendant's examination or in closing argument. We disagree. On direct examination, defendant expressly claimed that R.C. had sex with him in exchange for his promise to provide her marijuana (which he did not actually have). Defendant emphasizes, however, that trial counsel did not ask defendant for enough details about his and R.C.'s encounter "to make his version of the events understandable, much less plausible." Specifically, defendant notes that trial counsel failed to ask defendant why R.C.

would lie about being raped.  <u>Strickland</u>, however, required trial counsel to present a meaningful challenge to R.C.'s version of events, not to provide a complete explanation for her accusation.  Trial counsel subjected the State's theory to effective adversarial testing through cross-examination before presenting the defense's own version of events.

During closing argument, trial counsel incorporated aspects of R.C.'s, LaParis's, and Rashawndra's testimony to build a case that R.C. consented to sex with defendant:

"I submit that Rashawndra and LaParis could not see a thing from where they were.  When you get the [photograph exhibits] imagine what you are seeing there at 1:30 at night and there are no lights on that stairway.  Those girls didn't see anything.  So what do we have?

We are left with [R.C.].  ***  11:30 at night three young girls flagged down cars look

[sic] for a ride home.  Get one to stop about 11:30.  They don't know the individuals and they get in the car.  Then they ask him for some food and then they have a beer or two when they are in the car and they ask him to get some Bacardi.  None of them are old enough to drink and that doesn't make a difference.  They are not here charged with drinking as minors.  That is not point [sic].  But the point is all this is taking place.

The defendant, the driver, gives them his name and address, 535 May Street.

Later

on when the police go look for the defendant they go to 535 May Street and they see this red car pull in.  So he gave them the truth.  He told them where he lived.  He gave them his name.

Think about that.  Do you go advertise yourself before you commit rape?  Hand out business card [sic] and say just in case you have any trouble finding me after this is over.  I respectfully submit no.

***

Mr. Nerheim [Assistant State's Attorney] would have you believe that when [defendant and the male passengers] got out of the car at the house they formulated this plan and everybody knew the rape was being planned.  If that was so, then the second man in the park he must have known it was a toy gun too or did he?  He wouldn't have been scared when the defendant pointed the gun to him.

Was he, in fact, scared?  There had been drinking going on.  I respectfully suggest just to keep the argument he didn't want any part of intercourse but to keep the argument down he agreed to fake it.  Not because he was scared.  Can't have it both ways.  Can't have planned it and be scared of it.  Doesn't jive [sic].  That is beside the point because the other gentleman isn't charged.  Defendant is.

* * *

*** Consider the [rape] kit.  Found sperm in there.  Doesn't indicate that it was rape.  There was, in fact, no physical trauma.  There was some scrapes on the knees.  But nothing from--nothing in the genital area inside or out.  It would seem to me that if there was forced used in the commission of intercourse there would be some bruises there.  ***

***

They were looking for a ride home that night.  They didn't get it.  I suggest they got

mad when they didn't get it.  They ran down the stairs they claim, all they while they

were running, [R.C.] did, climbed a fence, pounded on the door.

What did they say to Mr. Draper?  They are after us.  They are going to kill us.  But

what did they tell the police?  They saw him get in their car and drive away.  Not that

they were being chased but that they, in fact, left.

I suggest they got mad.  They got very mad because they are left at this park and

they are no closer to home then when they started out at 11:30.  Maybe further for

all I know.  I don't know the distance.  There are too many inconsistencies in these

statements.  The problem with telling a lie and telling a bunch of them is that it is too

damn hard to remember.

*** Was there intercourse?  Yes.  Absolutely.  The stipulation is in.  My client has

admitted to it.  He had intercourse with this young lady.  Did she come to regret it

later?  Maybe.  I don't know.  I don't know.

But the fact is that they claim somebody is chasing them trying to murder them when

they have actually told the police they went the other way.  They saw someone

wearing white when, in fact, I turned my back I didn't see it.  And he had on an

orange shirt.  Said they could see it perfectly.  Even though when you look at the pictures and see when the spots were identified you see how much distance there was on this, how much foliage or shrubbery of trees and you have to imagine this in July when all the leaves and everything are on there and saying it was so dark they could hardly walk down the stairs and yet tell you halfway down this flight of stairs they could see what was going on behind the bushes upstairs.  No way.  No way."

Trial counsel competently argued that the State did not meet its burden.  Trial counsel identified weaknesses in the State's case and suggested, impliedly if not expressly, that the sex between R.C. and defendant was consensual.[2]  Trial counsel's failure to refer back to defendant's testimony that R.C. had sex with defendant in exchange for a promise of marijuana was not objectively unreasonable advocacy.  Since it was undisputed that R.C. and defendant had sex on the night in question, the jury was left to decide whether the sex was consensual.  Trial counsel effectively advanced the defense's case by emphasizing the internal problems in the State's theory that the sex was nonconsensual.  The failure of trial

---

[2]  The State evidently believed that trial counsel was arguing consent, for in its rebuttal the State expressly addressed the issue.

counsel to incorporate positive evidence of the particular circumstances that prompted R.C.'s alleged consent did not vitiate the closing argument.

We find that trial counsel's performance, judged as a whole, satisfied Strickland's standard of reasonableness. However, even if trial counsel failed to meet the Strickland reasonableness standard through any of the failures alleged above, we could not say that defendant was thereby prejudiced. The rape of R.C. was attested to by two witnesses besides R.C. herself, and all three presented relevantly similar testimony. Other State's witnesses corroborated the women's accounts. A Waukegan police officer testified that he discovered clothes in the place where, according to the women, defendant ordered them to drop their extra clothes. Additionally, Charles Draper testified that the women were disheveled and distressed when they came to his house in the early morning hours of July 24, 2002. Most significant is defendant's written statement to police, which, though delivered in broken English, can be construed essentially as a confession that defendant took R.C. to the park to have sex with her and that she submitted to intercourse in fear of the gun defendant possessed. It was for the trier of fact to weigh defendant's claim that the confession was false and that he gave it only out of fear. Given the amount of evidence of defendant's guilt, we cannot say there is a reasonable probability that the outcome of the trial would have been different had trial counsel's performance been to defendant's expectations.

## II. The Lawfulness of Defendant's Increased Sentence

Defendant's next contention on appeal is that the trial court contravened section 5--8--1(c) of the Unified Code of Corrections (730 ILCS 5/5--8--1(c) (West 2002)) by

increasing his sentence from 12 to 24 years on the conviction of aggravated criminal sexual assault. Section 5--8--1(c) provides: "A motion to reduce sentence may be made, or the court may reduce a sentence without motion, within 30 days after the sentence is imposed. *** [T]he court may not increase a sentence once it is imposed." 730 ILCS 5/5--8--1(c) (West 2002). The trial court explained that it doubled the sentence on the aggravated criminal sexual assault conviction in order to preserve the 24-year sentence that the court originally envisioned for the rape of R.C..

Defendant argues that section 5--8--1(c), as interpreted in People v. Kilpatrick, 167 Ill. 2d 439 (1995), and subsequent cases, does not permit an increased sentence on a single conviction even where the total number of years remains the same as before. In Kilpatrick, the trial court originally sentenced the defendant to consecutive terms of nine and six years of imprisonment on his convictions of home invasion and attempted murder. Convinced by the defendant's motion to reconsider that consecutive sentences were not appropriate under the facts, the trial court vacated the consecutive sentences and imposed a " 'single sentence of 15 years on the plea of guilty to the two counts.' " Kilpatrick, 167 Ill. 2d at 441. Relying on section 5--8--1(c)'s statement that "the court may not increase a sentence once it is imposed" (730 ILCS 5/5--8--1(c) (West 2002)), the supreme court held that the trial court "impermissibly increased the sentences for defendant's two convictions, from six and nine years for each offense, to 15 years' total incarceration." Kilpatrick, 167 Ill. 2d at 447. The supreme court reasoned that the fact that the "total number of years' imprisonment remained the same *** [did] not negate the fact that defendant's sentence was increased, from either six or nine years' incarceration to 15 years in prison." Kilpatrick,

167 Ill. 2d at 447. The increase prejudiced the defendant in that it "delayed by a considerable period of time the date on which the defendant could request parole, thereby causing the defendant substantial prejudice." Kilpatrick, 167 Ill. 2d at 447. The court explained the policy behind its construction of section 5--8--1(c):

"Interpretation of section 5--8--1(c) to prevent the sentencing court from increasing a defendant's term of imprisonment under the facts of this case serves the goals identified in [North Carolina v. Pearce, 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969)], i.e., the risk that the defendant will be penalized for his efforts to seek and obtain relief with respect to alleged errors in the sentence he received. Although we do not believe that the circuit court in the instant cause was motivated by any ill-will against the defendant, it is necessary to construe section 5--8--1(c) according to its plain terms and in a fashion that reasonably protects a defendant's legitimate interest in unbiased sentencing. A defendant should not have to run the risk that a challenge to his consecutive sentencing will result in a resentencing of increased length. Such a risk would have an improper chilling effect on a defendant's decision to challenge a consecutive sentence as imposed by the trial court and could violate fundamental principles of due process of law." Kilpatrick, 167 Ill. 2d at 447.

Chief Justice Bilandic and Justice Heiple dissented. Both argued that, because defendant's sentence remained at 15 years total, there simply was no increase in his sentence. See Kilpatrick, 167 Ill. 2d at 448-49 (Bilandic, P.J., and Heiple, J., dissenting).

Kilpatrick was followed in People v. Jones, 168 Ill. 2d 367 (1995), where the trial court, on the defendant's motion, vacated the defendant's consecutive sentences of 25 years each on his convictions of attempted murder and armed robbery, on the ground that it had failed to admonish defendant during his guilty plea of the possibility that the court might impose consecutive sentences. The trial court resentenced defendant to a single term of 30 years' imprisonment with respect to his attempted murder conviction, but imposed no new sentence on the armed robbery conviction. The supreme court held that section 5--8--1(c) did not permit the increased sentence on the attempted murder conviction. Jones, 168 Ill. 2d at 372.

We agree with defendant that section 5--8--1(c), as interpreted in Kilpatrick and Jones, controls here. The State attempts to distinguish these authorities on the ground that they involved errors more substantial than the mere "clerical mistake" that the trial court rectified here. While we appreciate the difference between the mending of a clerical error and the correction of a misapprehension of law, we cannot ultimately conclude that section 5--8--1(c) recognizes that difference. As Kilpatrick noted, section 5--8--1(c) "[b]y its express terms *** forbids the increase in a sentence once it has been imposed." Kilpatrick, 167 Ill.

2d at 446.[3]  Section 5--8--1(c) is concerned only with the modified sentence itself, not with whatever manner of error the modification rectified, <u>e.g.</u>, mistake of law or clerical error. The categorical nature of the prohibition also makes it immaterial whether the defendant sought the modification or the trial court made it <u>sua sponte</u>.

"[I]n determining whether the defendant's sentence was improperly increased, we consider the individual sentences, not the aggregate of the sentences imposed." <u>People v. Miller</u>, 286 Ill. App. 3d 297, 300 (1997).  The trial court was not permitted to increase the sentence on defendant's conviction of aggravated criminal sexual assault despite the fact that the total number of years of incarceration remained at 24 years.  Therefore, we reduce defendant's sentence on the conviction for aggravated criminal sexual assault from 24 years to 12 years.  Having so held, we need not address defendant's alternative argument that the sentence of 24 years was excessive in light of applicable sentencing factors.

For the foregoing reasons, we affirm the judgment of the circuit court of Lake County as modified herein.

Affirmed as modified.

CALLUM and KAPALA, JJ., concur.

---

[3]  Section 5--8--1(c) does not supply a definition of "impose," which raises interesting questions.  For instance, if a trial court orally pronounces a sentence of 10 months but, in the same breath, corrects itself and articulates a sentence of 10 years, has the trial court increased an already imposed sentence?  We need not explore this issue since, under any meaningful construction, a sentence is imposed if it is contained in a written order issued by the court.