NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 221029-U

NO. 4-22-1029

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 22, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Tazewell County |
| ELISSHA C. BOUGHTON, | ) | No. 21CF375 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

_____

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Steigmann and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Under the circumstances of this case, the sentence of eight years' imprisonment was not an abuse of discretion and, hence, was not a plain error.

(2) Because the sentence was not an abuse of discretion, it was within the wide range of reasonable professional assistance for defense counsel to refrain from filing a motion for a reduction of the sentence.

¶ 2    In the circuit court of Tazewell County, a jury found defendant, Elissha C. Boughton, not guilty of attempted first degree murder (720 ILCS 5/8-4(a), 9-1 (West 2020)) but guilty of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)). The court sentenced her to imprisonment for eight years. Defendant appeals, arguing that a sentence of such severity is, in the circumstances of her case, a plain error. Alternatively, she argues that, by failing to file a motion for a reduction of the sentence, defense counsel rendered ineffective assistance. We conclude that

defendant has failed to show either a plain error or ineffective assistance. Therefore, we affirm the circuit court's judgment.

¶ 3                                                I. BACKGROUND

¶ 4        In the jury trial, the State called Nicholas Clark, who testified essentially as follows. He used to date defendant. On June 29, 2021, he visited defendant in her second-story apartment in Delavan, Illinois, and stayed overnight. The next morning, his phone vibrated off a dresser top and fell into a garbage can. When retrieving his phone, he saw, in the garbage can, a used condom. He confronted defendant about this discovery, and they "had a disagreement about it." He decided to leave. As Clark was gathering his things, defendant went to a closet, but he did not see if she took anything out of the closet. She followed him out of the apartment, down the stairs, out of the apartment building, and into the parking lot. On the way out of the apartment and to the parking lot, they said nothing to one another.

¶ 5        Clark's car was parked next to defendant's car, but their cars were facing in opposite directions. Only Clark and defendant were in the parking lot. She went to her car. He unlocked the driver's-side door of his car and opened the door. As he was bent over, putting his belongings inside his car, he heard a gunshot. He backed out of his car and looked up. Defendant was walking around her car, coming toward him with a pistol in her hand. As Clark was standing next to his driver's-side door, she fired a second shot, which ricocheted off the trunk of his car and went through the back windshield. She fired a third shot, which hit the roof of his car. He backed up toward the front of his car, with his hands raised. Then, aiming directly at him, with her gun arm fully extended, she fired a fourth shot, which punctured the gym shorts he was wearing but missed him. Still aiming at him, she pulled the trigger two more times, but now the pistol did not fire. She opened up the pistol as if to wonder, "['W]hat's wrong with this thing[?']" closed it back

- 2 -

up, pointed it at him again, and pulled the trigger two more times, but still the pistol did not fire. She then jumped in her car and drove away, almost running over Clark as he stood in her way and tried to prevent her from leaving. No words had been exchanged between them from the time he walked out of her apartment to the time she sped away. He telephoned the police.

¶ 6    The police pulled defendant over, arrested her, and seized the pistol from the front passenger seat of her car. It was a .38-caliber revolver, and all the cartridges in its cylinder were spent. A Tazewell County detective, Ricardo Mancha, interviewed defendant at the police station. The interview was video-recorded.

¶ 7    Defendant's statement to the police was essentially as follows. Clark was her ex-boyfriend. She and Clark agreed that on June 29, 2021, he would come to her apartment. When Clark came over, she had a pistol in a closet of her apartment. She had obtained the pistol from a close friend, whose name she refused to divulge. As Clark was leaving her apartment, she took the pistol out of the closet. Deciding not to fire the pistol inside the apartment building, she followed Clark outdoors, taking the pistol with her. She had little familiarity with firearms, and at first, she accidentally fired a shot into the ground. Then she aimed the pistol at Clark and at his car and kept firing until the pistol was empty. Her intention, she told the police, was to shoot Clark without killing him. She aimed for his car and for his feet. After using up the ammunition in the pistol, she got in her car and drove away.

¶ 8    An Illinois state trooper, Erin Bowers, interviewed Clark and collected the gym shorts that Clark was wearing at the time of the shooting. In the left leg of the shorts, near the bottom hem, was a hole.

¶ 9    On April 26, 2022, the jury found defendant not guilty of attempted first degree murder but guilty of aggravated discharge of a firearm.

¶ 10    On June 24, 2022, the circuit court held a sentencing hearing, in which the court considered, among other evidence, a presentence investigation report. In police reports that were attached to the presentence investigation report, defendant had complained of successive acts of vandalism to her car. In October 2020, for instance, all four tires on her car were slashed. In December 2020, defendant reported that the back windshield of her car been smashed—by Clark, she believed. In April 2021, defendant complained that, in a parking lot in Peoria, Illinois, Clark had bumped into the front of her car with his car.

¶ 11    There were other police reports, and they involved Clark. In November 2020, Clark had an argument with defendant in her apartment, and he refused to leave. In December 2020, he kicked her car and tried to get in. In March 2021, he caused another disturbance in her apartment. In April 2021, he reportedly spat on her in a parking lot, poured beer on her, and punched her.

¶ 12    Two Tazewell County cases in which defendant had obtained emergency orders of protection against Clark were dismissed for lack of prosecution. It appears that defendant had an on-and-off relationship with Clark. She told the probation officer that, after moving out of Peoria to get away from Clark, she revealed to Clark where she was living and resumed her relationship with him.

¶ 13    Defendant's mother, Bertha Boughton, told the probation officer that "defendant's Bi-Polar Disorder is aggravated by stress" and that "since this relationship [with Clark] was stressful, the defendant's mental health also took a downturn." Jail incident reports involving defendant were attached to the presentence investigation report. The probation officer noted "the number of reports reflecting odd behavior, rules violations, and comments of suicidal thoughts."

¶ 14    On September 21, 2021, while defendant was in the Tazewell County jail, awaiting trial on the charges in the present case, another criminal case was instituted against her, in which

she was charged with two counts of aggravated battery (720 ILCS 5/12-3.05(d)(4) (West 2020)). According to a jail incident report by a correctional officer at the jail, Tyler Clark, defendant committed these aggravated batteries on September 18, 2021. On that date, according to Tyler's report, he and another correctional officer, Ashlynne McGraugh, entered defendant's cell and requested that defendant exit her cell and sit in the day room. Defendant asked why. Tyler explained to defendant that because she was disrespectful to him the night before and because she had violated detainee cell guidelines, her belongings were being confiscated. Defendant refused to leave the cell but told the correctional officers that if they wanted her belongings, they might take them. As Tyler and McGraugh were collecting defendant's things, defendant threw her blanket at McGraugh and began throwing her papers. Tyler continued in his incident report:

> "We attempted to gain control of her arms with soft empty hands. When we did this[,] [defendant] yelled at us to not touch her and began hitting at us. She struck McGraugh in the head with a closed hand and hit me in the head as well with a closed hand. McGraugh removed [defendant] from her bunk and escorted her onto the ground. McGraugh and I both gave verbal command[s] to quit fighting us. [Defendant] continued to fight with us [and] began to get off the ground. I drew my Taser ***, turned it on, and fired it at her center mass as it was the largest area available to me. It had an immediate disabling effect[,] and [defendant] [lay] on her back. I commanded [defendant] to roll onto her stomach[,] which she did. McGraugh and I applied handcuffs to [defendant]."

Later, after collecting the property, the correctional officers removed the handcuffs from defendant without further incident.

¶ 15 The probation officer did not question defendant about hitting the correctional officers. He questioned her, however, about the aggravated discharge of a firearm. Under the heading of "Attitude/Values," the presentence investigation report reads:

> "The defendant had very mixed expressions about the offense. She stated the victim, Nicholas Clark, 'bullied' her. She also stated she thought they just had a 'fight or misunderstanding,' until he stated on the stand that he felt she was trying to kill him. She advised she never thought she would ever do something like shoot at someone. She states during the trial, when he stated she was trying to kill him, she was hurt by the comment, as she thought it was just a serious argument, and that they could still be friendly. Overall, she described the situation was very emotional and she lost control when he kicked the mirror to her car, damaging it. She expressed she was not making logical decisions in the moment.

> *** It was clear her expression of shooting at the victim during this offense being an argument or misunderstanding was a vast mischaracterization which could only be described as deception or being out of touch with reality.

> *** The defendant described her first arrest as a major physical fight with her sister 24 years ago. While physical fighting was not always a component, she further described a lot of conflict with her mother, past boyfriends, and her current boyfriend. When asked her perspective on whether life is a struggle with survival of the fittest or if living by the Golden Rule or if she was someone who moved back and forth between these two stances depending on the situation, she agreed with the latter."

¶ 16     Under "Marital/Family Comments," the presentence investigation report stated that "[w]hen the defendant had a serious fight with her younger sister at age 18, just after high school, she was told there was a no-contact order and she could not live with her mother and siblings." Defendant was now 41 (according to the presentence investigation report). At times, she had been homeless, living in shelters. At times, she had lived with relatives. At times, she had lived in her own apartment. More than once, she has been admitted into a nursing home for psychiatric care and stabilization. For the 12 months prior to her arrest in the present case, she had lived in public housing. She reported that "she [had] worked for several staffing agencies as a [certified nursing assistant] before her incarceration" and that, on June 1, 2021, she began working part-time for Cross Country Medical Staffing Network." Because of the number of hours she had been working, "she claimed she was in very good financial condition with no worries about money before her arrest." The probation officer remarked, "Yet, the defendant was living in Section 8 Housing through the Pekin Housing Authority, therefore, it is difficult to quantify this exactly."

¶ 17     In addition to the presentence investigation report, the circuit court viewed a video, which the defense presented as mitigating evidence. The video showed Clark bumping defendant's car with his car and an ensuing argument between defendant and Clark. Defendant testified that, in this video, Clark was the driver of the car that hit her car. She further testified that the statements she had made in the police reports were accurate.

¶ 18     Defendant also made an allocution statement. She said she was "remorseful for ever having anything to do with [Clark], period," and that, additionally, she was "remorseful [for her] actions using the firearm." She realized, in retrospect, that she should have turned Clark down when he urged her to " 'work it out.' " Her resort to a firearm, she explained, was "a direct retaliation" for his months of going back and forth between abuse and apology. She shot his car

- 7 -

because he had inflicted over $3000 worth of damage to her car. "I wasn't shooting at him," she claimed. Rather, she "shot at his car intentionally." She acknowledged, "That is not right"—but she was "just tired," and she "[had not] want[ed] him to come back," because he was abusive. She accused the police in the jail as having "pretty much *** the same outlook as [Clark had] toward[ ] her, as far as bullying and just [an] over-the-top confrontational attitude toward[ ] [her]." She complained that she had "been called more racial slurs since [she had] been in this jail than [in her] whole life"—and that if she yelled back at the person insulting her, she was the one who got written up. She understood that the "gun was dangerous." She explained, however:

> "It was my attempt to finally stand up for myself. I am a woman. I was trying to get a grown man to stop harassing me all by myself.
>
> I recently discovered that he had three other people who also had enough problems with him where the police had to be called, all this during the ten-month span that he was supposed to be dealing with me. I had an idea about it. I wasn't upset about it. I just wanted him to leave and stay gone, stay over there. But he kept—he would—he kept on coming back to the apartment.
>
> I feel like 15 years is too long for somebody that was trying to defend their self. That's all I was trying to do."

¶ 19    After the allocution statement, the circuit court explained its reasoning for the sentence it was about to announce. The court began with the statutory factors in aggravation. The court found two such factors. The first aggravating factor was that defendant's conduct had threatened serious harm not only to Clark but also to the inhabitants of the "apartment building a hundred feet away." See 730 ILCS 5/5-5-3.2(a)(1) (West 2020). The second aggravating factor

was the need for deterrence. See *id.* § 5-5-3.2(a)(7). "The use of a firearm to settle an argument or misunderstanding warrants deterrence of others," the court concluded.

¶ 20 On the other hand, the circuit court found two statutory mitigating factors. The first mitigating factor was that defendant had been the victim of domestic violence. See *id.* § 5-5-3.1(a)(15). The second mitigating factor was that defendant had no criminal history—"a strong consideration," the court remarked. See *id.* § 5-5-3.1(a)(7). In addition, the court took into account, as nonstatutory mitigating factors, defendant's education (a general equivalency degree and some college classes) and her employment history.

¶ 21 Because defendant had been, as defense counsel put it, "self-sufficient" and law-abiding for the 33 years of her life preceding the shooting incident, defense counsel urged the circuit court to sentence defendant to probation—notwithstanding the charges of aggravated battery, to which defendant recently had pleaded guilty. The court, however, had concerns. Not only did defendant lack, as the court put it, "a strong family network," but her "peer association" was questionable. A friend had supplied defendant with the pistol that defendant subsequently used to shoot at Clark. The "minimization" of this shooting incident also was concerning to the court: "the explanation *** regarding a misunderstanding or an argument and it being justified and being escalated to the use of a handgun." Mental health, the court noted, could "cut both ways in terms of mitigating and aggravating here."

¶ 22 At the conclusion of its rationale, the circuit court reiterated that, regardless of whether it had specifically addressed one topic or other, the court had taken into consideration every matter presented in the sentencing hearing, including "the presentence investigation" and "what's been argued here by counsel." The court decided that, on balance, the fitting sentence for defendant's aggravated discharge of a firearm conviction was imprisonment for eight years.

¶ 23　　　　　Defense counsel never filed a postsentencing motion. On August 8, 2022—46 days after the sentencing hearing—defendant filed a *pro se* motion for a reduction of the sentence. The circuit court struck the *pro se* motion, however, on the grounds that it was untimely and that the court lacked jurisdiction to consider it.

¶ 24　　　　　　　　　　　　　　II. ANALYSIS

¶ 25　　　　　　　　　　A. Our Jurisdiction Over This Appeal

¶ 26　　　　　To be timely, a notice of appeal "must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from or if a motion directed against the judgment is timely filed, within 30 days after the entry of the order disposing of the motion." Ill. S. Ct. R. 606(b) (eff. Mar. 12, 2021). The final judgment in a criminal case is the oral pronouncement of the sentence. See *People v. Allen*, 71 Ill. 2d 378, 381 (1978); *People v. Toolen*, 116 Ill. App. 3d 632, 643 (1983). In the present case, the circuit court orally pronounced the sentence on June 24, 2022. To be timely, a postsentencing motion or notice of appeal had to be filed no later than July 24, 2022, which was 30 days after sentencing. See 730 ILCS 5/5-4.5-50(d) (West 2020). Neither a postsentencing motion nor a notice of appeal was filed during that 30-day period. Therefore, defendant missed the deadline for appealing.

¶ 27　　　　　Illinois Supreme Court Rule 606(c) (eff. Mar. 12, 2022) allows a late notice of appeal on the following conditions:

> "On motion supported by a showing of reasonable excuse for failing to file a notice
> of appeal on time filed in the reviewing court within 30 days of the expiration of
> the time for filing the notice of appeal, or on motion supported by a showing by
> affidavit that there is merit to the appeal and that the failure to file a notice of appeal
> on time was not due to appellant's culpable negligence, filed in the reviewing court

within six months of the expiration of the time for filing the notice of appeal, in either case accompanied by the proposed notice of appeal, the reviewing court may grant leave to appeal and order the clerk to transmit the notice of appeal to the trial court for filing. However, when the appellant is filing the motion *pro se* from a correctional institution, the appellant may submit, in lieu of the affidavit referred to herein, a certification as provided in section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109)."

¶ 28 Within 30 days after the expired deadline for filing a notice of appeal—that is, on or before August 23, 2022—defendant did not file in the appellate court a "motion supported by a showing of reasonable excuse for failing to file a notice of appeal." *Id.* Therefore, within six months after the expired deadline for filing a notice of appeal—that is, on or before December 26, 2022 (see 5 ILCS 70/1.10, 1.11 (West 2022))—defendant had to file in the appellate court three documents. First, she had to file a motion for permission to appeal. See Ill. S. Ct. R. 606(c) (eff. Mar. 12, 2022). Second, she had to file a proposed notice of appeal. See *id.* Third, she had to file an affidavit "showing *** that there is merit to the appeal and that the failure to file a notice of appeal on time was not due to appellant's culpable negligence." *Id.*

¶ 29 On November 30, 2022, within the six-month deadline, defendant filed in the appellate court a motion for permission to appeal and a proposed notice of appeal, combined into one document. She also filed in the appellate court an affidavit in which the following explanation was written after the preprinted language "State reasons that you did not file a notice of appeal in this case within 30 days of sentencing": "Sent to Logan Correctional Center for 3 weeks then sent to D.C.C. where I was immediately put to work." After the preprinted language "State why you believe your appeal has merit," the following was written: "Important factors that were failed to

- 11 -

be presented in court/ineffective counsel." It could reasonably be debated whether being transferred to different correctional centers—each of which presumably had pen, paper, and mail delivery--adequately explains the failure to file a notice of appeal within 30 days after sentencing. Also, it is reasonably debatable whether the merits of a proposed appeal are shown by vague, conclusory language such as "Important factors that were failed to be presented in court/ineffective counsel." Even so, within the prescribed time, defendant filed documents that colorably conformed to Rule 606(c), and therefore, on December 1, 2022, we allowed her motion to file a late notice of appeal.

¶ 30    The State challenges our jurisdiction because the supporting affidavit required by Rule 606(c) is not in the common-law record from the circuit court. The appellate court, however, received a supporting affidavit from defendant. The rule says that the motion to file a late notice of appeal, the proposed notice of appeal, and the affidavit must be "filed in the reviewing court." *Id.* By taking judicial notice of our own records, as we may do (see *People v. Brown*, 2023 IL App (2d) 220334, ¶ 26 n.2), we find the affidavit requirement to have been fulfilled. Therefore, we grant defendant's motion to take judicial notice of the affidavit in the appellate court's records, and we conclude that we have jurisdiction over this appeal.

¶ 31                              B. Procedural Forfeiture

¶ 32    "[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). The postsentencing motion must be filed within 30 days after the sentence was imposed. See 730 ILCS 5/5-4.5-50(d) (West 2022). In this case, no postsentencing motion was filed within 30 days after sentencing. Therefore, any sentencing issue is unpreserved. See *Hillier*, 237 Ill. 2d at 544.

¶ 33                          C. The Theory of Plain Error

¶ 34        We may review a claim of unpreserved sentencing error only if the defendant shows

the applicability of the plain-error doctrine. See *id.* at 545. Specifically, the required showing is as

follows:

>            "To obtain relief under this rule, a defendant must first show that a clear or obvious
>
>            error occurred. [Citation.] In the sentencing context, a defendant must then show
>
>            either that (1) the evidence at the sentencing hearing was closely balanced, or
>
>            (2) the error was so egregious as to deny the defendant a fair sentencing hearing."
>
>            *Id.*

¶ 35        Defendant claims that her sentence is excessive and, for that reason, erroneous.

Specifically, she argues that her

>            "sentence is excessive in light of the sentencing court's overstatement of evidence
>
>            in aggravation and where there was significant mitigating evidence that justified a
>
>            sentence closer to the minimum, including [her] being the victim of domestic
>
>            violence, her expression of remorse and cooperation with the police, her stable
>
>            housing arrangements, employment, and education, her history of mental health
>
>            issues, and her lack of [a] criminal record."

Defendant invokes both theories of plain error. In her view, the mitigating factors dwarf the

aggravating factors. Also, she complains that by failing to balance the factors fairly, the circuit

court deprived her of a fair sentencing hearing.

¶ 36        To win relief under the plain-error doctrine, defendant must begin by establishing

the commission of a clear or obvious error. See *id.* We could break down this threshold requirement

by first considering whether defendant has shown the commission of any reversible error at all, for

"[a]bsent reversible error, there can be no plain error." *People v. Naylor*, 229 Ill. 2d 584, 602 (2008). Reversible error is necessary but insufficient to cross the threshold of plain-error analysis—the error additionally would have to be "manifest or patent," that is to say, clear or obvious. *People v. Hammons*, 2018 IL App (4th) 160385, ¶ 17. But unless the circuit court committed a reversible error, there would be no occasion to decide whether the error was clear or obvious.

¶ 37　　We begin, then, by considering whether (assuming no forfeiture of this contention) the sentence is reversibly erroneous in the sense of being too severe. The sentence, we note, is within the statutory range. Aggravated discharge of a firearm is a Class 1 felony (see 720 ILCS 5/24-1.2(a)(2), (b) (West 2020)), and Class 1 felonies are punishable by imprisonment for not less than 4 years and nor more than 15 years (see 730 ILCS 5/5-4.5-30(a) (West 2020)). Eight years' imprisonment is within the range of punishment that the legislature has delineated for the offense of which defendant was convicted. See *id.* In fact, eight years' imprisonment is closer to the lower end than to the higher end of the statutory range. "A sentence that falls within the statutorily prescribed range is presumed to be appropriate." *People v. Hampton*, 2021 IL App (5th) 170341, ¶ 136. The burden is on defendant to rebut this presumption of appropriateness. See *People v. Lovell*, 2022 IL App (3d) 200516, ¶ 19.

¶ 38　　To carry that burden, defendant must establish that the sentence is an abuse of discretion. See *id.* ¶ 18. The Fourth District has explained this standard of review as follows:

> "An abuse of discretion will not be found unless the court's sentencing decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it. [Citation.] Also, an abuse of discretion will be found where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly

disproportionate to the nature of the offense. [Citation.] A trial court's sentencing decision is entitled to great deference, and we may not substitute our judgment for the trial court's merely because we might have weighed the sentencing factors differently." (Internal quotation marks omitted.) *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 28.

¶ 39 With that deferential standard of review in mind, we turn to defendant's argument that the sentence of eight years' imprisonment is an abuse of discretion. Defendant argues that "[t]he most important factors to consider in fashioning an appropriate sentence are the seriousness of the crime and the degree of harm caused by the defendant." More accurately, it is an aggravating factor that "the defendant's conduct caused *or threatened* serious harm." (Emphasis added.) 730 ILCS 5/5-5-3.2(a)(1) (West 2020). At the sentencing hearing, the circuit court found that defendant's conduct posed "a risk to not only Mr. Clark, but the public, and a serious risk." Defendant does not appear to dispute that she put Clark in danger of serious bodily harm. She disputes, however, that she endangered anyone else. Thus, she contends that the aggravating factor of threatened harm was overstated.

¶ 40 Defendant has a reasonable argument here. She aimed only at the ground, at Clark, and at his car. She did not aim in the direction of anyone else, and thus, by her logic, the public (other than Clark) was not in danger. That defendant has a reasonable argument, however, does not make the circuit court's contrary position unreasonable. The question for us is whether, by finding that defendant put the public at serious risk, the court made a finding that was fanciful or arbitrary, a finding with which no reasonable person could agree. See *Lawson*, 2018 IL App (4th) 170105, ¶ 28. When we look at the photographs in the record, the apartment buildings appear to be rather close to where defendant fired the pistol. There is the row where defendant and Clark

had parked, and then there is a space large enough for cars to back out and go by one another, and then there is another row for parked cars, and then there are apartment buildings. When we see the photograph of the gouge that a bullet left in the asphalt of the parking lot, it does not seem impossible that the bullet, if fired or ricocheted in the direction of an apartment building, could have gone through a windowpane or a vinyl-sided wall. Admittedly unfamiliar with firearms, defendant accidentally fired a shot into the pavement. She could have accidentally fired, instead, in the direction of an apartment building, or the bullet could have ricocheted off the pavement or off a car and in the direction of an apartment building. Arguably, someone who knows little or nothing about firearms but who nevertheless discharges a firearm, repeatedly, in a populated area endangers everyone in the vicinity. The danger comes from the person's ineptitude and inexperience in the use of firearms. On this logic, we are unconvinced that every reasonable person would disagree with the circuit court that defendant threatened serious harm not only to Clark but also to other members of the public.

¶ 41     The threat of serious harm contributes to the seriousness of the offense, which is the most important factor in the sentencing decision (*People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 112). To be sure, the sentencing court should take into account any other relevant factors as well, "including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). But "[t]he most important sentencing factor is the seriousness of the offense, and the court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense." (Internal quotation marks omitted.) *Aquisto*, 2022 IL App (4th) 200081, ¶ 112. The appellate court has explained, "The word 'offense,' in the phrase the 'seriousness of the offense,' means not the statutory offense

in the abstract but the offense as committed by the defendant: the particular facts and circumstances of the defendant's offense." *Id.*

¶ 42    Four circumstances or features of the offense as committed by defendant could have reasonably led the circuit court to regard the offense as rather serious.

¶ 43    First, defendant fired *at* Clark, intending to shoot him. Firing at the victim, with the intention and expectation to strike the victim, is not, strictly speaking, an element of aggravated discharge of a firearm. Rather, all the statute requires is discharging a firearm "in the direction of another person"—not quite the same as shooting at a person. See *People v. Hartfield*, 2020 IL App (4th) 170787, ¶¶ 68-69 (in which a similar distinction is explained). Thus, a defendant could deliberately aim above the victim's head or to the side of the victim, intending to miss the victim and to merely scare the victim, and the defendant thereby would discharge the firearm in the direction of the victim. But if a defendant deliberately aims a firearm at a victim and pulls the trigger, intending that the bullet rip through the victim's flesh, the defendant has done more than fire in the victim's direction. According to defendant's statement to the police, she intended to shoot Clark, not just shoot in his direction. Arguably, that fact elevates the seriousness of the offense above the baseline. To say that defendant merely fired in Clark's direction does not fully describe her wrongdoing with the pistol.

¶ 44    Second, the bullet hole in Clark's shorts tends to suggest that defendant put Clark in imminent mortal danger. Clark had a close call. If the bullet had struck him in the leg—as it nearly did—he could have bled to death.

¶ 45    Third, defendant fired repeatedly. Each discharge of the firearm in Clark's direction could have been a separate count, a separate unit of prosecution. See *id.* That the State chose to charge defendant with only one count of aggravated discharge of a firearm would not have

precluded the sentencing court from taking into consideration that defendant committed that offense multiple times.

¶ 46 Fourth, even after committing the offense of aggravated discharge of a firearm multiple times, defendant evinced an intention to persist in committing that offense. Upon running out of ammunition after firing every cartridge in the cylinder of her revolver, she continued aiming at Clark and pulling the trigger.

¶ 47 So, arguably, the offense was especially serious. The circuit court was entitled to give greater weight to the seriousness of the offense than to rehabilitation or to mitigating factors such as defendant's having been the victim of domestic violence, her expression of remorse, her cooperation with the police, her stable housing arrangements, her employment, her education, her history of mental-health problems, and her lack of a criminal record. *Aquisto*, 2022 IL App (4th) 200081, ¶ 112. Moreover, some of these mitigating factors might be regarded as questionable or less than compelling. For example, the mere fact of having a psychological disorder is not inherently mitigating. See *People v. Thompson*, 222 Ill. 2d 1, 42-43 (2006). The expression of remorse in defendant's allocution statement might have come across as an unconvincing revision in light of what defendant had told the probation officer: that the incident in the parking lot was "just a serious argument." Defendant's representation in her allocution statement that she "wasn't shooting at [Clark]" is inconsistent with her statement to the police that she had intended to shoot Clark in the feet. Such an inconsistency could be important. In assessing a defendant's potential for rehabilitation, the sentencing court might take into account the defendant's credibility. See *Perruquet*, 68 Ill. 2d at 154. Arguably, while the lack of a prior criminal record at the time of the present offense bodes well for rehabilitation, the commission of further felonies while one is in custody, awaiting trial, bodes ill for rehabilitation.

¶ 48    In short, in defendant's case, the considerations are mixed. There is cause for severity, and there is cause for leniency. A reasonable person could take the view that the sentence of eight years' imprisonment fairly reflects that mixture. By dialing the punishment down to somewhat below the mid-range, the circuit court took account of the mitigating factors. By stopping at eight years—four years above the minimum—the court took account of the aggravating factors, such as the seriousness of the offense and the commission of further felonies while in custody. We are unconvinced, then, that the sentence is an abuse of discretion. And we are far from convinced that the sentence is a clear or obvious abuse of discretion. Finding no plain error, we give effect to the procedural forfeiture of the sentencing issues. See *Hillier*, 237 Ill. 2d at 545.

¶ 49                          D. The Theory of Ineffective Assistance

¶ 50    Defense counsel was obligated to render professionally reasonable assistance, and we strongly presume that he fulfilled that obligation. See *People v. Rodriguez*, 364 Ill. App. 3d 304, 312 (2006). Professionally reasonable assistance does not require defense counsel to file a postsentencing motion in every case as a matter of course. See *People v. Houston*, 363 Ill. App. 3d 567, 577-78 (2006). Defense counsel could legitimately decide that a postsentencing motion is called for only if the sentence is an abuse of discretion. As we have concluded, the sentence in this case was not an abuse of discretion. Therefore, defense counsel's decision to refrain from filing a postsentencing motion was "within the wide range of reasonable professional assistance" (*Rodriguez*, 364 Ill. App. 3d at 312). We find no ineffective assistance.

¶ 51                                    III. CONCLUSION

¶ 52    For the foregoing reasons, we affirm the circuit court's judgment.

¶ 53    Affirmed.