NOTICE
Decision filed 10/04/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 190093-U

NO. 5-19-0093

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 17-CF-401 |
| | ) | |
| KEITH R. RITCHESON, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the judgment of trial court. The defendant was not denied the effective assistance of counsel where he fails to demonstrate any prejudice as a result of his trial counsel stipulating to the admission of the defendant's interrogation videos as evidence. The defendant was similarly not denied the effective assistance of counsel where his posttrial counsel declined to raise the aforementioned issue in his supplemental motion for a new trial.

¶ 2    On September 13, 2018, after a bench trial, the defendant, Keith R. Ritcheson, was convicted of four counts of first degree murder in violation of sections 9-1(a)(1) and 9-1(a)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1), (a)(2) (West 2016)), for the murder of his parents, Burl and Brenda Ritcheson. Additionally, the trial court found that during the offenses of first degree murder, the defendant personally discharged a

1

firearm that proximately caused the death of the two victims in violation of subsection (d)(iii) to section 5-8-1 of the Unified Code of Corrections (730 ILCS 5/5-8-1(d)(iii) (West Supp. 2017). At sentencing on January 31, 2019, the trial court imposed a sentence of natural life in prison on two counts of first degree murder, dismissed the other two counts pursuant to the one-act, one-crime rule, and noted that the sentence imposed was mandated by statutory law.

¶ 3    The defendant raises two issues on appeal. He argues that (1) his trial counsel was ineffective for stipulating to the admission of the defendant's interrogation videos as evidence and (2) his posttrial counsel was ineffective for failing to raise the aforementioned issue in his supplemental motion for a new trial. For the following reasons, we affirm the judgment of the circuit court of Jackson County.

¶ 4                                 I. BACKGROUND

¶ 5    On September 6, 2017, the defendant was charged by indictment with four counts of first degree murder. Counts 1 and 3 alleged that the defendant, without lawful justification, killed Burl and Brenda Ritcheson, in that, in performing the acts which caused the deaths of Burl and Brenda, the defendant shot Burl and Brenda with a firearm, knowing such act would cause the deaths of Burl and Brenda, thereby causing the deaths of Burl and Brenda, in violation of section 9-1(a)(1) of the Code (720 ILCS 5/9-1(a)(1) (West 2016)). Counts 2 and 4 alleged that the defendant, without lawful justification, killed Burl and Brenda Ritcheson, in that, in performing the acts which caused the deaths of Burl and Brenda, the defendant shot Burl and Brenda with a firearm, knowing such act created a strong probability of death or great bodily harm to Burl and Brenda, thereby causing the

2

deaths of Burl and Brenda, in violation of section 9-1(a)(2) of the Code (*id*. § 9-1(a)(2)). In conjunction with all four counts of first degree murder, it was further alleged that the defendant personally discharged a firearm that proximately caused the death of Burl and Brenda Ritcheson, in violation of subsection (d)(iii) to section 5-8-1 of the Unified Code of Corrections (730 ILCS 5/5-8-1(d)(iii) (West Supp. 2017)).

¶ 6     A bench trial took place September 11-13, 2018. The following testimony was elicited at trial. At around 24 minutes past midnight on August 14, 2017, Shauna Taylor, a patrol deputy for the Jackson County, Illinois, sheriff's office, received a dispatch call to respond to a residence near Murphysboro, Illinois, regarding a possible shooting. Deputy Taylor was the first officer to arrive at the house, where she found the defendant sitting on the front porch. Deputy Taylor asked the defendant what happened, and the defendant stated that his parents had been shot and that he did not think they were still alive. Deputy Taylor testified that the defendant, who had been living with his parents for four years after going through a divorce and losing everything, was very calm and did not seem emotional. Deputy Taylor further testified that the defendant then led her from the front porch to the south side of the house near the garage to a door, which was standing open. The defendant explained to deputy Taylor that when he had returned to the house from a trip to purchase beer, the door was open and that was unusual. Thereafter, the two proceeded through the door, which led into the house from the garage. As they passed through the garage, the defendant informed deputy Taylor that the interior door in the garage that led into the house was also open, and had been when he got home, which was also unusual.

¶ 7    For officer safety, deputy Taylor asked the defendant if he had any weapons on him, so the defendant lifted his shirt to show his waistband, where deputy Taylor did not observe any weapons on the defendant's person. The two then proceeded through the door of the residence into a living room and then the kitchen. From the kitchen, there was a threshold that met another living room. At that threshold, to the left, there was a hallway, and here the defendant and deputy Taylor stopped. Deputy Taylor testified that she did not feel comfortable going any further into the house because she was by herself, so they waited for another officer to arrive to ensure the house was clear. The defendant informed deputy Taylor that his mother's and father's bedrooms were at the end of the hallway—mother's on the left and father's on the right. Deputy Taylor testified that when additional police officers arrived, she and the other officers checked every single room in the house to ensure that no one was hiding. Other than the deceased victims, police officers did not find anyone else inside the house.

¶ 8    Deputy Taylor testified that when she made it to the end of the hallway where the deceased's bedrooms were located, both of the doors leading into each bedroom were open and the bedrooms' lights were on. Brenda Ritcheson was lying on the floor of the left bedroom and Burl Ritcheson was lying on his right side on the bed in the right bedroom. Deputy Taylor initially observed that Burl was "very bloody," having blood all over the front of his shirt, and he appeared to be deceased. In the left bedroom across the hallway from Burl's, deputy Taylor stated that Brenda was lying at the foot of the bed on the floor, face down, with her feet toward the door. Deputy Taylor did not see any blood, but it appeared to her that the back of Brenda's shirt was torn, and that Brenda also appeared to

4

be deceased. Deputy Taylor's sergeant, Mark Wilson, had called an ambulance, and once the house was cleared, paramedics came in to check both Burl and Brenda.

¶ 9 Deputy Taylor testified that she then returned to the living room to speak with the defendant. She asked the defendant what had happened, and the defendant said that earlier that evening, his parents had been arguing and that he did not want to stay there. The defendant told deputy Taylor that he did not know what his parents were arguing about, that he tries to stay out of their disagreements as it is not his business, and that they mostly argued about money. Because of this, the defendant told deputy Taylor that he left the house around midnight to go buy beer at the Circle K gas station near Williams Street, which intersects with Route 13 in Murphysboro, and when he returned home, he found his parents both shot in their rooms. The defendant stated that he was only gone for around 20 minutes and that when he returned home, the open door to the garage immediately caught his attention, as well as the interior garage door being open. The defendant also told deputy Taylor that it was unusual for his parents' bedroom doors to be open and for their lights to be on. After observing his parents' bodies, the defendant told deputy Taylor that he called 911. Deputy Taylor testified that while she was speaking with the defendant in the living room, she noticed, and thought it was odd, that a cold and sweating beer was sitting on the table next to a chair and that it did not look to have very much missing from it. When deputy Taylor asked the defendant about the beer, he stated that he had opened the beer when he called 911. Deputy Taylor noted that aside from the defendant's deceased parents, she observed no signs of forced entry, nothing appeared to be out of place or obviously missing, nor any evidence of a fight, struggle, or trauma in the house.

5

¶ 10     Deputy Taylor asked the defendant whether there were any firearms present in the house and the defendant said that there were three—Burl owned two: one .22 semi-automatic handgun and one .410 shotgun, and the defendant owned one, but he did not tell deputy Taylor what type of firearm it was. The defendant also did not tell deputy Taylor where his firearm was located; however, he stated that Burl kept his two firearms in the garage on a shelf. Deputy Taylor testified that she did not have an occasion to observe the shelf that the defendant was referring to, but that she relayed this information to sergeant Wilson.

¶ 11     Deputy Taylor testified that she asked the defendant what he thought had happened that night before the police arrived. The defendant stated that it was pretty obvious that someone had come in and shot his parents. Deputy Taylor asked the defendant if he suspected anyone, and the defendant gave her two men's names, both of whom were former business associates of Burl. The defendant further told deputy Taylor that he did not think either of the two men would personally come into his house and shoot his parents, but he thought they might have hired someone to do it. Shortly thereafter, detective Chris Liggett with the Jackson County Sheriff's Office arrived and asked the defendant if he would come to the sheriff's office, and the defendant agreed.

¶ 12     Sergeant Cory Etherton with the Murphysboro Police Department also responded to assist in the investigation of Burl and Brenda's shootings. Sergeant Etherton testified that he collected the video surveillance footage from the Circle K gas station where the defendant had purchased a 12-pack of Miller High Life bottles and a fifth bottle of vodka at around 11:57 p.m. on August 13, 2017. The defendant left the store one minute later.

6

¶ 13    Beau Nance, a crime scene investigator (CSI) with the Jackson County Sheriff's Office, testified that on August 14, 2017, at around 12:40 a.m., he was called to assist in investigating Burl and Brenda's shootings, and arrived at the defendant's house around 1 a.m. CSI Nance testified that when he arrived at the house, he photographed everything. While moving through the defendant's bedroom, CSI Nance observed a 9-millimeter handgun in a holster with some paperwork lying on top of it. CSI Nance also noted a discharged shell from a .410-gauge firearm sitting on the headboard of the defendant's bed. Additionally, CSI Nance found a very large amount of empty vodka bottles, approximately 50, between the bed and the wall, under the headboard. CSI Nance testified that later, while investigating the tree line and wooded area surrounding the residence, he noticed a substantial amount of empty vodka bottles. After processing and collecting relevant evidence from the crime scene, CSI Nance was redirected to the sheriff's office in order to take a gunshot residue kit on the defendant. This test was conducted in the sheriff's department's interview room while other detectives were interrogating the defendant. On the next day, August 15, 2017, CSI Nance went to the Williamson County, Illinois, morgue to observe and photograph the autopsies of Burl and Brenda.

¶ 14    Another CSI, Lindsay Legere with the Jackson County Sheriff's Office, was also called to assist in investigating Burl and Brenda's shootings. While moving through the house, CSI Legere located a .22-caliber shell casing in Burl's bedroom near the entrance and another two .22 casings were found on top of the nightstand in Burl's bedroom and near the side of his bed. CSI Legere testified that he also went to the Williamson County morgue to observe the autopsies of Burl and Brenda. While there, CSI Legere was provided

7

with three projectiles and wadding (the inside of a shotgun shell that encases the pellets), from a shotgun shell, and 12 pellets from a shotgun shell that was fired from a shotgun that were removed from Burl's body. CSI Legere testified that he left before Brenda's autopsy because he went to assist other detectives with serving and executing a second search warrant on the Ritchesons' property in an attempt to locate another shell casing, but the police did not find any other casings.

¶ 15   The investigations' supervisor and detective sergeant with the Jackson County Sheriff's Office, Jon Kilquist, testified that he met with the defendant's son, Kenneth Hiser, on August 14, 2017. Detective sergeant Kilquist testified that he collected two firearms from Kenneth, a .22-caliber long rifle and a Taurus Judge firearm.

¶ 16   Dr. John Heidingsfelder, a medical doctor and forensic pathologist, testified as an expert in forensic pathology. Dr. Heidingsfelder performed the autopsies of Burl and Brenda on August 15, 2017, and he testified that Burl had four gunshot wounds of different types present on his body—one to the left temple, two others to the midline/front and left side of his chest, and a shotgun wound to the left front of his chest. Based on his training and experience, Dr. Heidingsfelder testified that the gun was a few inches away when it was discharged at Burl's head, but the exact distance would have to be determined by a ballistics expert. Further, Dr. Heidingsfelder testified that the shot to Burl's left temple, where the bullet never exited the body, was a cause of death, and in his experience, would result in an immediate period of unconsciousness, followed shortly by death. When asked if he formed an opinion as to the manner and cause of Burl's death, Dr. Heidingsfelder testified that the manner of death was homicide, and that Burl died as a result from the

8

brain injury from the gunshot to the head, *i.e.*, cerebral disruption, as well as bilateral hemothorax, which is blood within the chest cavity due to multiple gunshot wounds.

¶ 17    With respect to Brenda's autopsy, Dr. Heidingsfelder testified that he initially noted a gunshot wound to her right elbow. Additionally, Brenda had a gunshot wound to the right side of her head, a gunshot wound to the left chest, and a shotgun wound to her back. Based on his training and experience, Dr. Heidingsfelder testified that the gunshot wound to Brenda's head was fired from a close range. When asked if he formed an opinion as to the manner and cause of Brenda's death, Dr. Heidingsfelder testified that it was the same as Burl's; the manner of death was homicide, and that Brenda died as a result of cerebral disruption and bilateral hemothorax due to multiple gunshot wounds.

¶ 18    Illinois State Police forensic scientist in firearms, tool marks, footwear, and tire track identification, Lauryn Vunetich, testified as an expert witness in firearm identification and examination. Vunetich testified that she conducted a microscopic comparison of the fired cartridge cases and, in her opinion, all five recovered .22-caliber cartridges were fired from the same firearm. Additionally, two of three recovered .22-caliber bullets were fired from the same firearm, but the origin of the third, damaged, bullet was inconclusive. One of the four recovered bullet fragments was also consistent with a .22-caliber, but Vunetich was unable to determine caliber or rifling characteristics for the other three, nor could Vunetich determine whether the four fragments were fired from the same firearm due to them being significantly damaged and having poor microscopic detail. Vunetich further testified that none of the examinable casings, bullets, or bullet fragments were fired by the defendant's son, Kenneth's, .22-caliber long rifle, which detective sergeant Kilquist had

collected from Kenneth on August 14, 2017, and of which Vunetich had test fired. Vunetich also testified that the shotgun wad and pellets recovered from the bodies of Burl and Brenda were consistent with .410 shot shells, and that they were also consistent with the wad from the .410 shot shell found on the defendant's headboard.

¶ 19    Illinois State Police forensic scientist in the trace evidence section, Ellen Chapman, testified as an expert witness in trace analysis. Chapman testified that she was asked to analyze gunshot residue (GSR) in this case. Chapman explained that GSR can be removed, including by handwashing, and that this particulate material will fall off, even when someone is not trying to get rid of the GSR, in about six hours after discharge and then become undetectable. Chapman testified that she administered a GSR kit on the defendant's hands and that the defendant's right hand tested positive for GSR, *i.e.*, the defendant had either discharged a firearm, came into contact with a GSR-related item, or was in the environment of the discharged firearm. The defendant's left hand tested negative for GSR. Additionally, Chapman testified that the tops of the defendant's shoes, as well as the shorts, that he was wearing on the day of the incident all tested positive for GSR. The defendant's t-shirt was also tested, and the results were consistent with GSR, but were ultimately inconclusive. The defendant was arrested after the GSR test results came back.

¶ 20    Before the State called its next witness, it requested for the trial court to read aloud a stipulation of fact and evidence that the parties had agreed to prior to trial on September 5, 2018, and file stamped on September 12, 2018. The stipulation read as follows:

"The People of the State of Illinois, by Casey E. A. Bloodworth, and the defendant, Keith R. Ritcheson, by and through his Counsel, Margaret Degen,

10

Jackson County Public Defender, hereby agree to the following facts, and hereby enter into this stipulation of facts and evidence:

1. The defendant, Keith R. Ritcheson, was interviewed seven times by Detectives with the Jackson County Sheriff's Office between August 14, 2017 and August 20, 2017. On each occasion, the interviews were recorded pursuant to 725 ILCS 5/103-2.1. Specifically, the following recorded interviews were conducted:

    a. People's Exhibit 1 – Recorded interview conducted with Keith R. Ritcheson on August 14, 2017 from 0213 hours to 0838 hours.

    b. People's Exhibit 2 – Recorded interview conducted with Keith R. Ritcheson on August 14, 2017 from 1915 hours to 2038 hours.

    c. People's Exhibit 3 – Recorded interview conducted with Keith R. Ritcheson on August 16, 2017 from 1014 hours to 1053 hours.

    d. People's Exhibit 4 – Recorded interview conducted with Keith R. Ritcheson on August 17, 2017 from 1757 hours to 2257 hours.

    e. People's Exhibit 5 – Recorded interview conducted with Keith R. Ritcheson on August 18, 2017 from 1038 hours to 1143 hours.

    f. People's Exhibit 6 – Recorded interview conducted with Keith R. Ritcheson on August 19, 2017 from 1455 hours to 1754 hours.

    g. People's Exhibit 7 – Recorded interview conducted with Keith R. Ritcheson on August 20, 2017 from 1453 hours to 1729 hours.

11

2. The Parties hereby stipulate that People's Exhibit 1 through 7 are accurate recordings of all statements made by Keith R. Ritcheson and are accurate recordings of all responses made by Keith R. Ritcheson to questions posed to him by investigators present during the interviews.

3. The Parties further stipulate that the interviews in People's Exhibits 1 through 7 were conducted in the Jackson County Sheriff's Office and that the recording equipment in use was operable and did not malfunction at any point during the recordings. The Parties further stipulate that there have been no changes, modifications or manipulates of the recorded interviews in People's Exhibit 1 through 7.

4. The Parties further stipulate that the recordings were stored on a hard drive within the Jackson County Sheriff's Office and were subject to retrieval. The Parties stipulate that Detective Ron Bohm, Jackson County Sheriff's Office, retrieved the recordings contained in People's Exhibit 1 through 7 and copied those recordings onto a DVD, one for each interview. The Parties stipulate that this copying process did not change, modify or manipulate the recordings in any way. The Parties stipulate that the recordings contained on the DVDs in People's Exhibit 1 through 7 are true and accurate copies of the recorded interviews made on the listed dates and times.

5. The Parties further stipulate that People's Exhibit 1 through 7 are being offered into evidence in the People's case in chief as People's Exhibits 1

12

through 7. The Parties stipulate that People's Exhibit 1 through 7 are admitted into evidence without objection."

Thereafter, the trial court indicated that it had received and reviewed all of the aforementioned exhibits from start to finish prior to the start of the defendant's trial. For the sake of brevity, we will outline the context of the videotaped interrogation evidence relevant to the defendant's contentions on appeal as needed within our analysis below.

¶ 21　Next, the State called Jackson County Sheriff's Office investigative detective Chris Liggett to the stand. Detective Liggett testified that he went straight to the scene after being called to assist in the investigation on August 14, 2017. Once at the scene, detective Liggett asked the defendant if he would come back to the sheriff's office with him to talk about what had happened, and the defendant agreed. Detective Liggett, along with detective Horstmann, conducted a series of interrogations with the defendant. The defendant told the detectives that there were three firearms in the house but that two of them were missing. Detective Liggett testified that as he and the defendant were leaving the house to go to the sheriff's office, the defendant reached his hand up on the shelf in the garage as they walked past it and told detective Liggett that there should have been two firearms up there—the .22 pistol and .410 shotgun.

¶ 22　In one of the interrogations, detective Liggett asked the defendant when he had last fired either of the missing firearms or any other weapon and the defendant stated that he had shot at a cat approximately one week earlier. Detective Liggett testified that he asked the defendant this question because detectives had made arrangements for a GSR test to be administered on the defendant, and the evidence collected from such a test would only be

13

present on the defendant for a limited amount of time, so detectives needed to know whether the defendant had recently shot a firearm. Detective Liggett further testified that one of the concerns he had with the defendant's initial interrogation was that, according to the defendant, he had figured out something was wrong once he discovered that the door to the garage, as well as the interior garage door, were both open after returning home from purchasing alcohol, and so, he had enough thought to go arm himself. However, after the defendant found his deceased parents, he stopped looking, put his own firearm up, and called 911 without checking the rest of the house. Detective Liggett testified that some of the defendant's observations about what the defendant saw and smelled caught his attention, as the smell of expended shells or gunpowder indicated the recency of the shooting, and it was more likely that whoever did it would still be present.

¶ 23    Detective Liggett testified that while discussing the timeline that the defendant established through his initial statement to the police, the defendant told detective Liggett that he had left the house somewhere between 15 and 25 minutes prior to his return, and before he left, his parents were up and actively arguing with each other, but when he returned, they were found shot and deceased. Detective Liggett further testified that after speaking with the defendant initially, there was no viable suspect, *i.e.*, detective Liggett did not learn of anybody who would potentially want to harm the defendant's parents. Detective Liggett also noted that throughout the various interrogations with the defendant, he learned that the defendant's parents were relatively strong religious people that did not allow any drinking in their home, and that the defendant's father was a recovering alcoholic, which made the fact that the defendant was drinking a beer during his 911 call

14

stand out to the detectives. Detective Liggett testified that it was the defendant's change in character that directed his interrogation questions. Initially, the defendant was a person who drank in secret due to his parents' rules, and made statements such as he "would rather drink warm beer rather than get caught"; however, on the night of Burl and Brenda's murders, the defendant had put alcohol in the refrigerator and then drank it in the living room. The defendant had placed his beer in the garage refrigerator, his bottle of vodka in the refrigerator in the kitchen, and brought an ashtray into the living room; all of which, detective Liggett believed, was behavior that the defendant's parents would have definitely disapproved of. Detective Liggett described this behavior as "almost like he [was] laying claim to his house now" because "[h]is parents were no longer in a position to catch him." Detective Liggett went on to note the many inconsistencies in the defendant's versions of events he told the detectives. As the defendant was confronted with his inconsistencies, he began to get upset, and in addition to Burl's former business associates, the defendant also suggested that some of Brenda's job clients or his son Kenneth could have had something to do with the murders.

¶ 24    On August 18, 2017, the defendant indicated that he wanted to provide some information to, or participate in a "quid pro quo," with detective Liggett. On August 19, 2017, the defendant informed detective Liggett that he was fed up with his parents arguing about him. On August 20, 2017, the defendant spoke with detective Liggett again and asked for a notebook to keep track of his own thoughts, which was provided. Later in the interrogation, the defendant informed detective Liggett that all of his statements made prior to that day were not true. Thereafter, the defendant admitted to shooting Burl, stating that

15

he did so because Burl was going to shoot Brenda. Detective Liggett testified that he took issue with the fact that, after the defendant shot his father in the alleged attempt to save his mother, he proceeded to make a "beer run" instead of instantly calling 911 and getting help. The defendant also admitted to detective Liggett that he had manipulated the crime scene. After this final interrogation, the defendant agreed to point out to the detectives where he had put the firearms from the shooting. Detective Liggett testified that he, detective Horstmann, and the defendant drove to the bridge that crosses the Beaucoup Creek off of Kimmel Bridge Road, which is where the defendant said he had thrown the firearms. However, after a thorough search of the water under the bridge and surrounding area, the firearms were never found.

¶ 25 On cross-examination, detective Liggett testified that during all of the interrogations, the defendant was always cordial with him; he had agreed to provide buccal swabs, voluntarily participated in the GSR testing kit, and provided fingerprints. The defendant also let detectives search his cellphone and provided the password for it. Detective Liggett testified that the defendant was pretty consistent with his statements that he did not shoot anyone up until the seventh interrogation, when everything changed, and he admitted to shooting his father. The defendant told detectives that Burl had stepped out of the doorway into the hallway from his bedroom and discharged a shotgun. Thereafter, the defendant claims to have shot his father who then dropped to the ground in the hallway. However, there was no sign of any blood in the hallway or on the floor surrounding the bed, which would have made it impossible for the defendant to have shot his father in the hallway and then move him onto his bed.

16

¶ 26    Detective Liggett testified that he thought the defendant drank too much, based on the amount of empty liquor bottles that were found in and near the residence. Detective Liggett further testified that the defendant had told him he did not have access to alcohol prior to or during his first interrogation, and that he could not remember if he ever smelled any odor of alcohol on the defendant's breath. At one point during the first interrogation, the defendant indicated that he was shaking, but detective Liggett did not attribute that to the defendant's lack of access to alcohol, nor did the defendant ever ask detectives if he could have an alcoholic drink. However, prior to the August 19, 2017, interrogation, detective Liggett had made arrangements with the corrections staff for the defendant to have a cigarette, and thereafter, the defendant indicated to the detectives that he was feeling better with no twitches. Detective Liggett testified that he never saw any signs of the defendant going through alcohol withdrawal, but that the defendant did tell the detectives in one interrogation that he had seen the jail nurse and had been given Librium.[1]

¶ 27    Detective Liggett testified that once the coroner had confirmed to the defendant that his parents were dead, the defendant became "the most emotional I remember." Detective Liggett further testified that detectives looked at several different people as potential suspects for who shot Burl and Brenda, but the defendant "was the only person we kept coming back to that we couldn't explain away." When asked if it was obvious to him that, during the final interrogation, the defendant was making up a story to please him, detective

---

[1] "Librium," or "chlordiazepoxide," is used to treat anxiety and acute alcohol withdrawal. This medication belongs to a class of drugs called benzodiazepines, which act on the brain and nerves (central nervous system) to produce a calming effect. See https://www.mayoclinic.org/drugs-supplements/chlordiazepoxide-hydrochloride-oral-route/side-effects/drg-20072246?p=1 (last visited Sept. 11, 2023).

Liggett answered "No," and stated that at that point, he felt like the defendant was trying to figure out what information the detectives had and was trying to make his story fit that. On redirect examination, detective Liggett testified that it is not uncommon for a suspect to try to figure out what the police know before they tell you their version of events, and that in his experience, this generally means that the suspect is hiding information or that they have pieces to a puzzle that they do not want to talk about until they realize that the police already know about it.

¶ 28    Thereafter, the State rested. The defendant then made an oral motion for a directed verdict, arguing that the State had failed to meet its burden of proof; specifically, that the State had failed to prove that the defendant was the person who discharged the firearm, proximately causing Burl and Brenda's deaths. In response, the State argued that the evidence established that the defendant, alone, was responsible for his parents' deaths, in that he had gunshot residue all over him and ultimately admitted to shooting his father "with a self-serving statement that it was in defense of his mother." The trial court denied the defendant's motion.

¶ 29    The defendant presented one witness, Gale Gladson, a registered nurse at the Jackson County jail. Gladson testified that she was working at the jail in August 2017, and that she met the defendant on the morning of August 18, 2017, soon after he was arrested. Gladson further testified that the defendant's intake documents indicated that he had hypertension and alcoholism. Gladson described the jail's protocol that is used for alcoholic inmates, including initially starting them out on Librium, which occurred in the defendant's case. Gladson saw the defendant every five to seven days, and one morning,

18

she observed the defendant in an altered mental state, confused and disoriented. The defendant was incontinent of urine and feces and had a temperature, likely due to withdrawal from alcohol. Gladson testified that the defendant was very sick soon after entering the jail, but she did not recall on which day the defendant was in an "altered state." At some point, the defendant was hospitalized for sepsis, and due to his chem profile and CBC results being abnormal, which could have been a result of dehydration. While at the hospital, it was determined that the defendant had a urinary tract infection, which turned into a kidney injury and dehydration issues, so the defendant had to be put on antibiotic therapy, which led to him having infectious diarrhea. Gladson testified that the defendant's hospitalization was not because he was an alcoholic, and that he returned to the jail on September 1, 2017.

¶ 30 The following morning, the defense rested without calling any additional witnesses. Thereafter, both parties gave closing arguments. Following the bench trial, the defendant was found guilty on all four counts of first degree murder. Additionally, the trial court found that during the offenses of first degree murder, the defendant personally discharged a firearm that proximately caused the death of the two victims. On October 9, 2018, the defendant filed a motion for a new trial, arguing that the trial court's verdict and firearm enhancement finding were contrary to the evidence presented at trial. That same day, the defendant filed a motion for extension of time to file an amended posttrial motion and to withdraw as counsel. The motion stated that following the defendant's convictions, when counsel met with the defendant to discuss potential issues for appeal or errors that the defendant wanted to include in a posttrial motion, it became clear to counsel that the

19

defendant wanted to assert a claim of ineffective assistance of counsel. The defendant's motion was granted, and new posttrial counsel entered an appearance on November 5, 2018.

¶ 31    On January 30, 2019, new posttrial counsel for the defendant filed a supplemental motion for a new trial, incorporating the original posttrial motion and additionally arguing that trial counsel was ineffective for failing to include anything in a pretrial transport motion and order about the jail guard who accompanied the defendant to a neuro-psychological evaluation being prohibited from revealing any confidential information. On January 31, 2019, a hearing was held on the defendant's posttrial motion. After argument, the trial court denied the defendant's motion, stating, in relevant part, that there was no actual prejudice to the defendant based upon the totality of the evidence presented at trial, and that even if there had been actual prejudice, counsel's action was a matter of trial strategy. After the trial court denied the defendant's posttrial motion, a sentencing hearing was held, where the trial court imposed a sentence of natural life in prison on two counts of first degree murder, dismissed the other two counts pursuant to the one-act, one-crime rule, and noted that the sentence imposed was mandated by statutory law. This appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, the defendant argues that he received ineffective assistance of counsel when trial counsel stipulated to the admission of the defendant's interrogation videos as evidence. The defendant contends that trial counsel was ineffective in stipulating to the admission, without redaction, of hours of videotaped interrogation of the defendant, which

20

included certain objectionable statements by detectives. The defendant argues that, due to the detectives' statements, significant portions of the videos were irrelevant, or, at a minimum, their probative value was substantially outweighed by the risk of unfair prejudice, and thus, he was prejudiced. The defendant further argues that posttrial counsel was ineffective for also failing to raise this issue.

¶ 34    We first note that, to preserve an issue for appeal, a defendant must typically raise the issue in an objection at trial and a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The failure to do so constitutes a forfeiture of the issue on appeal. *Id*. However, for a claim of ineffective assistance of counsel, trial counsel is not expected to argue their own ineffectiveness in a posttrial motion. *People v. Ramos*, 339 Ill. App. 3d 891, 900 (2003). Where, as here, the posttrial motion is drafted by different counsel, normal forfeiture rules apply. *Id*.; see also *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 136.

¶ 35    In the instant case, the defendant was represented by trial counsel when the first posttrial motion was filed. Trial counsel, thereafter, filed an additional motion indicating that the defendant wished to present a claim of ineffective assistance of counsel, and thus, trial counsel requested to withdraw as counsel and that new counsel be appointed to properly present the defendant's claims in a new motion for new trial. The trial court granted trial counsel's request, allowed trial counsel to withdraw, appointed new posttrial counsel, and granted an extension of time to allow for posttrial counsel to amend or file a new posttrial motion as necessary. Posttrial counsel then filed a posttrial motion, arguing that trial counsel was ineffective for failing to include anything in a pretrial transport motion and order about the jail guard who accompanied the defendant to a neuro-

21

psychological evaluation being prohibited from revealing any confidential information. While posttrial counsel filed a new posttrial motion where the defendant argued before the trial court that trial counsel provided ineffective assistance based on a different issue, the issue argued on appeal was not included.

¶ 36 Posttrial counsel did not ultimately draft the defendant's appellate brief, which was prepared by the Office of the State Appellate Defender. Despite including a claim in the defendant's appeal regarding ineffective assistance of posttrial counsel for failure to include the issue on appeal in the defendant's posttrial motion, appellate counsel does not address the forfeiture or argue plain error. However, the State also failed to argue forfeiture in its brief. Thus, the State has forfeited any claim of forfeiture. See *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 29 (the State may forfeit a claim of forfeiture by failing to raise it). Moreover, "forfeiture is a limitation on the parties and not the reviewing court, and we may overlook forfeiture where necessary to obtain a just result or maintain a sound body of precedent." *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 65. In the interest of justice, we decline to find forfeiture and proceed to address the merits of this specific claim.

¶ 37 In criminal prosecutions, a defendant has a constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Moore*, 2020 IL 124538, ¶ 28. Claims alleging ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Domagala*, 2013 IL 113688, ¶ 36. Where, as here, the specific claim of ineffective assistance of counsel was not first raised in the trial court, our review is *de novo*. *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 85.

¶ 38     To establish the ineffective assistance of counsel, the defendant must prove (1) that counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and (2) that he suffered prejudice. *Strickland*, 466 U.S. at 687. Defense counsel's conduct is presumed to fall within the wide range of professionally reasonable assistance. *People v. Rodriguez*, 364 Ill. App. 3d 304, 312 (2006). Furthermore, there is a strong presumption that counsel's action or inaction was a matter of trial strategy (see *People v. Evans*, 186 Ill. 2d 83, 93 (1999)), and matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel's strategy is so unsound that she entirely fails to conduct any meaningful adversarial testing of the State's case (see *People v. Patterson*, 217 Ill. 2d 407, 441 (2005)).

¶ 39     To establish prejudice, the defendant must show that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 687. "A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Enis*, 194 Ill. 2d 361, 376-77 (2000).

¶ 40     Here, the defendant argues that he was prejudiced by objectionable statements included in the video evidence that was viewed by the trial court. The defendant argues that the evidence should have been excluded, and that he was prejudiced when trial counsel entered a stipulation without redactions or caveats, to the entirety of the defendant's interrogation videos, because portions of the videos were irrelevant; or, at a minimum, their probative value was substantially outweighed by unfair prejudice.

23

¶ 41 The defendant alleges, specifically, that the interrogation videos contained several instances of prejudicial and irrelevant evidence that ultimately denied him a fair trial. First, the defendant argues that trial counsel should have objected to the admission of portions of the video interrogations where the detectives told the defendant that they had interviewed many people, including members of his family, and that his aunt Betty "wouldn't answer" when she was asked if the defendant could have killed his parents. His uncle Charles did not deny the possibility either. Additionally, the defendant objects to those portions of the video interrogations where the detectives stated, based on purported conversations with various people from the family, church, and elsewhere, that Brenda was "afraid" of the defendant. The detectives further indicated that the defendant had previously threatened his dad, and that they repeatedly brought up a past event in which the defendant backed his truck over Burl. The defendant argues that this information was irrelevant and did not make any fact that is of consequence to the determination of the action more probable or less probable (see Ill. R. Evid. 401 (eff. Jan. 1, 2011)), and the defendant offered no meaningful responses to make the statements relevant. See, *e.g.*, *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 38. The defendant further argues that even if these statements provided probative value, they were outweighed by the danger of unfair prejudice. Accordingly, the defendant asserts that these statements painted a portrait of him as a dangerous person, feared even by loved ones, and therefore, should have been kept from the trier of fact.

¶ 42 Next, the defendant argues that trial counsel was ineffective in failing to object to portions of the interrogations where the detectives repeatedly referred to data from Burl's

24

pacemaker, and compared pacemakers to a "black box" in an airplane, asserting that they are "pretty impressive" at communicating records about the wearer's heart. The defendant argues that the detectives claimed that the data from Burl's pacemaker contradicted the defendant's account of the evening by showing that Burl never had an elevated heart rate and thus, never engaged in any argument that night at all. The defendant argues that none of these claims were proven or verified, and because he was unaffected by the information, the detectives' statements were irrelevant, hearsay, and constituted improper lay opinion about technical information beyond their expertise. Accordingly, the defendant argues that the effect of this information was unfairly damaging to his credibility and improperly bolstered the State's case.

¶ 43    The defendant further argues that trial counsel was ineffective for failing to object to the inclusion in the video evidence of comments where the State attempted to undermine his credibility about shooting guns at animals on his parents' property through unverified, hearsay-laden statements by the detectives. The video evidence included the detectives' claims that they spoke to "everybody" in his neighborhood, and reported that "no one" ever saw or heard him or Burl shooting guns on the property, including one neighbor, former law enforcement, who allegedly stated that if someone was shooting a gun in the area, he would have known and called it in. The defendant further states that the detectives repeatedly asserted that no spent casings were recovered from outside the Ritchesons' home or from the garbage cans on the property. The defendant argues that these statements had no meaningful effect on him or his explanations, and thus, were not relevant to show

his reactions, and even if they held probative value, the statements were unreliable hearsay, and the probative value was too small to justify its admission at trial.

¶ 44    Finally, the defendant argues that trial counsel was ineffective for failing to object to the contents of the videotaped interrogations where the detectives made various other statements that should have been excluded from evidence. These statements included "baseless efforts to undermine [the defendant's] credibility by saying as a matter of fact that [the defendant] only went to church with his mother, and his mother had not been to church in weeks, so he was not at church earlier the day of the incident," and asserting that his ex-wife, "who seemed 'reliable' to them, told them about how [the defendant] was a liar about even small things, would never admit to it, and that their marriage failed as a result." The defendant further asserts that the detectives improperly opined and drew conclusions about their perceptions of the evidence, making statements such as the defendant was not credible, that the GSR test was the "real deal," that the alcohol in the house was a "huge" deal, and that they asserted that the longer the interrogations went, the more certain they were that the defendant had killed his parents.

¶ 45    The defendant argues that all of the aforementioned evidence was irrelevant, "or at least ran afoul of Rules 801 and 403," and "[s]ince the constitution requires effective counsel to use the applicable rules of evidence to shield her client form [*sic*] a trial based on unreliable or otherwise inadmissible evidence, [the defendant's] trial counsel performed deficiently by stipulating to the use of this material at trial." The defendant further argues that he was prejudiced by his trial counsel's deficient performance, claiming that there is a reasonable probability that, but for counsel's errors, he would have been found not guilty.

26

As such, the defendant argues that this court should reverse and remand this case for a new trial.

¶ 46　We first note that the State was entitled to introduce the videotaped interrogation evidence during its case-in-chief since any statement made by an accused, unless excluded by the privilege against self-incrimination or other exclusionary rules, may be used against him as an admission even if it is not inculpatory or against his interest. *People v. McCallum*, 2019 IL App (5th) 160279, ¶ 55. As a result, generally, an officer's questions or statements in a videotaped interrogation are admissible to demonstrate their effect on the defendant, to explain the defendant's response (or lack thereof), and to explain the course of the officers' interview/investigation. *People v. Davila*, 2022 IL App (1st) 190882, ¶ 51. Even statements including opinions and observations as to a defendant's guilt or credibility may be presented in the videotaped interrogations even if they are inadmissible as direct testimony. *Id*. In certain circumstances, redacting the remarks would render the defendant's responses nonsensical; in other instances, police accusations may simply serve as a standard and is a permissible interrogation tactic. *Id*. While this court acknowledges that a police officer's statements during a videotaped interrogation are ultimately subject to both relevancy requirements and weighing their probative value against their prejudicial effect, each case involving a videotaped interrogation must be decided on its own facts while viewing the statements of both the police and the defendant in the context of the entire video and against the evidence offered at trial. *Id*. ¶¶ 52-53.

¶ 47　Here, however, such analysis is not required, as the defendant's claims fail to satisfy the prejudice prong of *Strickland*. A defendant's failure to satisfy either prong of the

*Strickland* test is fatal to his claim of ineffective assistance of counsel. *People v. Albanese*, 104 Ill. 2d 504, 527 (1984). As a result, where it is easier to dispose of a claim of ineffective assistance of counsel on the ground that it lacks a sufficient showing of prejudice, a reviewing court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient. *People v. Johnson*, 2021 IL 126291, ¶ 53 (citing *People v. Givens*, 237 Ill. 2d 311, 331 (2010)). *Strickland* requires a defendant to "affirmatively prove" that prejudice resulted from counsel's errors. *Strickland*, 466 U.S. at 693. Upon examination of the record, we find that the defendant's claims of ineffective assistance of counsel are without merit, as he has not established that the outcome of his trial would have been different were it not for the inclusion of the complained-of evidence.

¶ 48 It is well established that, in a bench trial, the trial court is presumed to have considered only competent evidence in arriving at the judgment. *People v. Pelegri*, 39 Ill. 2d 568, 575 (1968). Only when it affirmatively appears from the record that the trial court considered incompetent evidence prejudicial to the defendant will the judgment be reversed. *People v. Smith*, 55 Ill. App. 2d 480, 488 (1965). For example, in *Smith*, the record revealed that the trial court gave weight to hearsay testimony of the complainant and to testimony of a second complainant after the charge involving the second complainant was dismissed. *Id.* Similarly, in *People v. McGrath*, 80 Ill. App. 2d 229 (1967), the record revealed that the trial court asked witnesses questions, eliciting hearsay testimony, and then relied upon such testimony in its judgment.

28

¶ 49 In this case, the defendant acknowledges that the trial court is presumed to have considered only competent evidence in arriving at the judgment, but states that said presumption should not be indulged here because the trial court did not indicate that it was excluding improper evidence from its consideration. The defendant cites *People v. Nuccio*, 43 Ill. 2d 375, 396 (1969), for the proposition that there are limits to the immunity to improper and prejudicial insinuations of which judges are presumed to possess. Where the guilt of the accused is not manifest, but is dependent upon the degree of credibility accorded by the trier of fact, and there appears in the record substantial numbers of unsupported insinuations which, if considered, could have seriously impeached the credibility of the defendant's witnesses, and there is no indication of the court's awareness of the impropriety, justice demands that the defendant be afforded a new trial free from such prejudicial misconduct. *Id*. The cases which have found that improper, unsupported insinuations of guilt constitute prejudice and require reversal have included substantial, repeated, and definitely prejudicial evidence. *People v. Strubberg*, 61 Ill. App. 3d 521, 525 (1978).

¶ 50 The State points out, and we agree, that the defendant cites to no authority that would support his proposition that improper consideration of evidence may be assumed, as the case law clearly states that there must be an affirmative appearance from the record that the trial court considered incompetent evidence prejudicial to the defendant. See *Smith*, 55 Ill. App. 2d at 488. Here, in making its finding, the trial court did not reference the complained-of statements made by the detectives contained in the interrogation videos when it found the defendant guilty of the offenses. The defendant fails to demonstrate from

29

the record any instance where it can be shown that the trial court improperly relied on any of this evidence. In contrast to *Nuccio*, the guilt of the defendant in this case is manifest and it is not apparent that the unsupported innuendoes by the detectives in the interrogation videos contributed to the verdict of guilty.

¶ 51    Moreover, the defendant has failed to demonstrate that, even if every challenged statement had been redacted, there would be a reasonable probability that the outcome of the proceeding would have been different. The defendant, by his own admission, shot his father. Even if the trial court had considered incompetent evidence, considering the other evidence presented at trial that was relevant to the defendant's guilt and credibility, we do not find that the complained-of statements made during the defendant's interrogations with the police would have served to unduly prejudice the defendant.

¶ 52    For example, during one of the interrogations, the defendant told the detectives that there were three firearms in the house but that two of them were missing—the .22 pistol and .410 shotgun. The third, a 9-millimeter handgun, was found in a holster in the defendant's bedroom. The trace analysis expert testified that in analyzing the results of the defendant's GSR testing kit, the defendant's right hand tested positive for GSR, *i.e.*, the defendant had either discharged a firearm, came into contact with a GSR-related item, or was in the environment of the discharged firearm. Additionally, she testified that the tops of the defendant's shoes, as well as the shorts, that he was wearing on the day of the incident all tested positive for GSR.

¶ 53    The firearm expert testified that she conducted a microscopic comparison for the fired cartridge cases collected from the crime scene and, in her opinion, all five recovered

30

.22-caliber cartridges were fired from the same firearm. Additionally, two of three recovered .22-caliber bullets were fired from the same firearm, and one of four recovered bullet fragments was also consistent with a .22 caliber, but none of the examinable casings, bullets, or bullet fragments were fired by the defendant's son's .22-caliber long rifle. She further testified that the shotgun wad and pellets recovered from the bodies of Burl and Brenda were consistent with .410 shotgun shells, and that they were also consistent with the wad from the .410 shotgun shell found on the defendant's headboard in his bedroom.

¶ 54 Detective Liggett noted the many inconsistencies in the defendant's versions of events that he told the detectives. As the defendant was confronted with his inconsistencies, he began to get upset. The defendant eventually admitted to detective Liggett that he shot Burl, stating that he did so because Burl was going to shoot Brenda. Detective Liggett pointed out, however, that the defendant presented with behavior that was inconsistent with that version of events in that, after the defendant shot his father in the alleged attempt to save his mother, he proceeded to make a "beer run" instead of instantly calling 911 and getting help. The defendant also admitted to detective Liggett that he had manipulated the crime scene; however, the crime scene was inconsistent with the defendant having shot his father in the hallway and moving him onto the bed, as there was no blood in the hallway or on the floor of the bedroom. Further, the defendant pointed out to the detectives where he had disposed of the firearms used in the shooting, even though the firearms were never found.

¶ 55 A defendant is entitled to a fair trial, not a perfect one. Likewise, ineffective assistance of counsel refers to competent, not perfect, representation. *People v. Easley*, 192

Ill. 2d 307, 344 (2000). Here, the record does not affirmatively show that the trial court relied upon incompetent evidence. Moreover, we do not find that the admission of the defendant's interrogation videos was overly prejudicial. In fact, based upon the overwhelming evidence of the defendant's guilt in this case, any potential prejudice from the complained-of statements from the interrogations, if any, was minimal, as the trial court could have reasonably found the defendant guilty without considering the complained-of evidence. Thus, we do not find that there is a reasonable probability that the result of the proceeding would have been different had counsel chosen not to stipulate to, or seek redactions of, the videos as evidence. Consequently, the defendant has failed to establish the second prong of the *Strickland* test.

¶ 56    Lastly, the defendant argues that his posttrial counsel was ineffective for failing to raise the issue that his trial counsel was ineffective for stipulating to the admission of the defendant's interrogation videos as evidence in his supplemental motion for a new trial. Posttrial counsel was appointed so that the defendant would have counsel with no conflict of interest to properly present the defendant's claims of ineffective assistance of trial counsel. Posttrial counsel filed a supplemental motion for a new trial and raised an issue of ineffective assistance that differed from the issue raised by appellate counsel.

¶ 57    Because we have fully reviewed the defendant's claims, despite the defendant's forfeiture in failing to raise them in the trial court when filing his supplemental posttrial motion, the defendant has failed to establish that he suffered any prejudice resulting from posttrial counsel's failure to present this issue on appeal in a posttrial motion for purposes of preserving the issue on appeal. Further, counsel is not required to further a frivolous or

32

patently nonmeritorious claim. *People v. Simms*, 192 Ill. 2d 348, 362 (2000). Accordingly, the defendant has failed to set forth a substantial showing of a claim of ineffective assistance of posttrial counsel.

¶ 58                            III. CONCLUSION

¶ 59    For the foregoing reasons, we affirm the judgment of the circuit court of Jackson County where the defendant was not denied the effective assistance of counsel at trial or posttrial.

¶ 60    Affirmed.